**TRI-STATE RUBBISH, INC.,**
**et al., Plaintiffs,**

v.

**WASTE MANAGEMENT, INC.,**
**et al., Defendants.**

**Civ. No. 92-122-P-C.**

United States District Court,
D. Maine.

Sept. 23, 1992.

452

Ralph Dyer, Portland, Me., for plaintiffs.

Carl Kandutsch, Verrill & Dana, Portland, Me., for Waste Management of Maine and Consol. Waste Services.

Michael A. Nelson, Portland, Me., for Mid–Maine Waste.

Thomas Monaghan, Portland, Me., for City of Auburn.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

GENE CARTER, Chief Judge.

In this case, which involves participants in the solid waste disposal business, Plaintiffs allege violations of state and federal antitrust law, state and federal civil rights law and state common law. Counts I, II, III, and III–A[1] of the complaint seek relief from Defendants City of Auburn, Mid–Maine Waste Action Corporation (MMWAC) and the Waste Management Defendants for allegedly combining to restrain trade and create monopolies in the waste hauling and disposal business in violation of sections 1 and 2 of the Sherman Antitrust Act. In Counts IV and V Plaintiffs seek relief from MMWAC and the Waste Management Defendants under Maine's antitrust law and common law.[2] Counts VI and VII allege that Defendant City of Auburn has violated Plaintiffs' constitutional rights to due process and equal protection in violation of 42 U.S.C. § 1983.[3] Count VIII seeks relief against Defendant City of Auburn under the Maine Civil Rights Act, 5 M.R.S.A. §§ 4682, 4683.

In separate motions[4], all Defendants have moved to dismiss the complaint. As this Court has recently stated:

> In ruling on a motion to dismiss, the Court must take the material allegations of the complaint as true and construe the pleadings in the light most favorable to Plaintiffs.... The motion will be granted "only if, when viewed in this manner, the pleading shows no set of facts which could entitle Plaintiff to relief." ... The Court, however, has "no duty to 'conjure up unpled allegations', in order to bolster the plaintiffs' chances of surviving a 12(b)(6) motion to dismiss." ... Plaintiffs must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."

---

1. There are two counts numbered III, so for ease of reference the Court has denominated the second count III as III–A.

2. Count IV purports to seek relief from all Defendants. However, Plaintiffs have explained in their memorandum in opposition to Defendant Auburn's motion to dismiss that they seek no relief from Auburn in that count.

3. Although Count VII also seeks relief under 42 U.S.C. § 1981, Plaintiffs have explained in their Memorandum in Opposition to Defendant Auburn's Motion to Dismiss that they seek no relief under that section, which is limited to claims of racial discrimination.

4. In its motion MMWAC has adopted the arguments made by the other Defendants in their memoranda.

*Gott v. Simpson,* 745 F.Supp. 765, 768 (D.Me.1990) (citations omitted).

The pertinent facts set forth in the complaint show that Plaintiff Tri–State Rubbish, Inc. is in the business of waste hauling, handling and processing, with a focus on the recovery of waste paper and recyclable materials. Plaintiff Recyclables Unlimited Services Corp. is an affiliate of Tri–State, and Plaintiff Guy Hart is the principal of both corporations. Defendant Mid–Maine Waste Action Corporation (MMWAC) is a public non-profit Maine corporation created by an interlocal agreement among twelve Maine municipalities to construct and operate a waste to energy facility for the disposal of solid waste generated by the participating municipalities and others. Defendant City of Auburn is one of the municipalities participating in the interlocal agreement. Defendant Waste Management Inc. is a holding company with various subsidiaries, also Defendants here, which operate waste collection and processing businesses. These subsidiaries include Waste Management of Maine, Inc. (WMI), which operates a waste collection business. Defendants Consolidated Waste Services, Inc. (CWS) and Consolidated Waste Transportation, Inc., ran a landfill and waste transportation business respectively and were acquired by WMM in July, 1990.

MMWAC is financed by private bonded indebtedness. In conformity with the bond contracts the twelve communities participating in MMWAC adopted Flow Control Ordinances mandating that all their acceptable waste be delivered to MMWAC. Each community, including Defendant Auburn, has also entered into a waste handling agreement with MMWAC by which it agrees to deliver all acceptable waste generated in the community to MMWAC at whatever tipping fee is necessary to produce revenues adequate to service MMWAC's debt. Since enactment of the flow control ordinances, Plaintiff Tri–State has collected waste in Auburn containing recyclable materials and delivered it to Recyclables a recycling facility in West Paris, Maine. MMWAC requested that Tri–State deliver solid waste collected in Auburn to MMWAC. MMWAC has denied conventional payment terms to Tri–State and has stated that more favorable tipping fees would be negotiated if Tri–State would comply. Defendants City of Auburn and MMWAC brought suit against Tri–State in Maine District Court to enforce the flow control ordinance. Although other waste haulers operating in Auburn do not deliver their waste to MMWAC, no similar suit has been brought against any other entity.

In February 1990, while the MMWAC waste-to-energy plant was being constructed, MMWAC contracted with two of the Waste Management Defendants, CWS and CWT, to build and operate a transfer station at which incoming waste from the member communities would be received. The waste was then taken to a landfill operated by another Waste Management Defendant. Because of the flow control ordinance and the contract, the transfer station operator has the exclusive right to receive all acceptable waste generated in the community.

MMWAC received $75 per ton for disposing of the acceptable waste in the participating municipalities. CWS and CWT received $66 per ton from MMWAC for operating the transfer station and taking the waste to the landfill. WMM, an affiliate of CWS and CWT, provides waste hauling services in the participating municipalities. Because of its affiliation with CWS and CWT, WMM must effectively pay a tipping fee of only $9 per ton in contrast to the $75 fee which must be paid by other haulers including Plaintiff Tri–State.

In March 1992 the MMWAC waste-to-energy plant went into operation and most of the acceptable waste from the member communities is now burned there. MMWAC member communities only generate about 37,000 tons of acceptable waste per year. The MMWAC plant needs about 64,000 tons per year, however, to operate at capacity, and, as Plaintiffs argue, "to meet power contract commitments and to operate efficiently." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, at 5. In order to get enough waste, MMWAC has entered into a contract with WMM whereby WMM col-

lects waste from outside the member communities and delivers it to the MMWAC facility. In return WMM pays a tipping fee much lower than the $75 charged to others. Plaintiffs allege that in an attempt to drive Tri–State and other competitors out of business, WMM is offering a predatory, "sweetheart" price to customers in what Plaintiffs refer to as the extended market area, the area outside the participating municipalities.

### I. *State Action Immunity*

The Sherman Act, under which Plaintiffs seek relief here, "was intended to promote competition and to block the formation of monopolies." *Sandy River Nursing Care Center v. National Council on Compensation Insurance,* 798 F.Supp. 810, 814 (D.Me.1992) (Brody, J.). Section 1 of the Sherman Act prohibits agreements in restraint of trade, and Section 2 prohibits actual and attempted interference with the competitive process or "monopolization." 15 U.S.C. §§ 1, 2. The Sherman Act promotes important federal economic goals. In deference to principles of federalism and state sovereignty, however, the Supreme Court established in *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943) that the federal antitrust laws do not apply to restraints of trade imposed by the states "as an act of government." In certain circumstances state action immunity is also afforded to actions taken by a municipality or to an entity that is "equivalent to a municipality." *See City of Columbia v. Omni Outdoor Advertising, Inc.,* — U.S. —, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Fisichelli v. City Known as Town of Methuen,* 956 F.2d 12, 14 (1st Cir.1992); *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9, 13 (1st Cir.1987). All Defendants here have moved to dismiss the federal antitrust claims against them on the grounds that they are entitled to state action immunity.

Distilling the recent teaching of the Supreme Court on this issue in *City of Columbia,* the Court of Appeals in *Fisichelli* has summarized the circumstances in which state action immunity is available to municipalities:

First, "*Parker* immunity" applies (*i.e.,* the antitrust laws do not apply) to actions taken by a municipality *if* the "municipality's restriction of competition ... [is] an authorized implementation of state policy." ...

Second, state law "authorize[s]" a municipal action (for antitrust immunity purposes) so long as it provides the municipality with a general grant of authority to take actions of *the sort* in question....

. . . . .

Third, in deciding whether state law authorizes the "restriction of competition" in question, the antitrust court is to decide whether such "suppression of competition is the 'foreseeable result' of what the [state] statute authorizes." ...

Fourth, in applying the "Parker immunity" doctrine, the courts should recognize no exception for "conspiracy," "bribery," or similar activity. "[W]ith the possible market participant exception [*i.e.,* when 'a city acts as a private firm'], *any* action that qualifies as state action is *ipso facto* ... exempt from the operation of the antitrust laws."

*Fisichelli v. City Known as Town of Methuen,* 956 F.2d at 14.

### A. *Count I*

In Count I Plaintiffs allege that Defendant City of Auburn conspired with MMWAC to monopolize illegally the collection and sale of recyclable waste in Auburn and the other participating municipalities. Plaintiffs argue that Auburn's interpretation of its flow control ordinance and waste handling contract to include recyclable waste is not authorized by any state policy.

By statute, Maine makes municipalities responsible for the disposal of solid waste generated within their borders. 38 M.R.S.A. § 1305. The Maine Legislature also has expressed its desire to promote the recovery of resources from solid waste and has acknowledged that a guaranteed, steady supply of waste is required to assure the economic feasibility of energy recovery facilities. *Id.* § 1304–B(1). To achieve its purpose given this limitation,

the Maine Legislature has "expressly authorized" municipalities to enact flow control ordinances requiring delivery of wastes generated within the municipality, or any portion of those wastes, to a designated disposal or reclamation facility. 38 M.R.S.A. § 1304–B(2). Defendant Auburn adopted just such a flow control ordinance, "intended to secure a reliable flow of waste-fuel to the plant in order to assure the plant's financial viability." Plaintiffs' Memorandum of Law in Opposition to Defendant City of Auburn's Motion to Dismiss, at 1. Auburn's enactment of its flow control ordinance, of which the Plaintiffs complain, is, therefore, the establishment of a monopoly over solid waste in direct implementation of state policy. *Fisichelli*, 956 F.2d at 14.

The Legislature also recognized that municipalities may be required to enter long-term agreements to provide energy recovery facilities with specific amounts of waste. To this end, the statute specifically grants municipalities the power to contract with public waste disposal corporations like MMWAC for the collection, transportation, storage, processing, salvaging or disposal of waste. 38 M.R.S.A. § 1304–B(1) and (4). The long term contracts may include whatever provisions the municipality may approve. *Id.* § 1304–B(4). The Waste Handling Agreement between Auburn and MMWAC requiring Auburn to cause to be delivered to MMWAC all acceptable waste collected by it and others within the municipality is, therefore, also "an authorized implementation of state policy." *Fisichelli*, 956 F.2d at 14.

If the municipality may by ordinance and contract require *all* solid waste to be delivered to the designated facility, persons who collect and dispose of recyclables, which are a category of waste materials, *see* 38 M.R.S.A. § 1303–C(20–22), may not be able to dispose of them as they choose. It was, therefore, obviously foreseeable to the Leg-

islature that the municipalities might acquire monopolies over solid waste including recyclable materials. *See Fisichelli*, 956 F.2d at 15. Moreover, the Legislature obviously anticipated that the flow control ordinances and waste handling contracts might have anticompetitive effects because it expressly exempted them from the operation of Maine's antitrust laws. 38 M.R.S.A. § 1304–B(6).[5]

Describing the evolution of the solid waste statutes, which also seek to promote recycling, Plaintiffs argue that it is not state policy to encompass recyclable material within the reach of the flow control ordinances and waste handling agreements. The Court disagrees. The Maine statute defines solid waste as "useless, unwanted or discarded solid material with insufficient liquid content to be free-flowing." 38 M.R.S.A. § 1303–C(29). The statute explicitly recognizes that some solid waste may be recyclable, but provides that this fact does not exclude such waste from being included in the definition of solid waste. *Id.* The state statutes clearly contemplate, therefore, that in enacting flow control ordinances and negotiating waste handling agreements "to gain management control over solid waste," *id.*, § 1304–B(2), municipalities may establish a monopoly on recyclable as well as nonrecyclable waste.

Plaintiffs note that in § 1304–B(2)(C), the statute also authorizes municipalities to designate certain wastes generated in the municipalities as recyclable and exempt them from the requirement that they be delivered to the designated waste disposal facility. Plaintiffs argue, therefore, that Tri–State's recycling activities are also in furtherance of an express state policy and therefore exempt from the flow control ordinance. The plain answer, however, is that while the flow control ordinance is permitted to include such a provision, Auburn's flow control ordinance does not.[6]

---

**5.** The Maine antitrust statutes parallel federal law in aspects pertinent to this case. *See* 10 M.R.S.A. § 1101 *et seq.*

**6.** Article II, § 2.1.1 of the Auburn Flow Control ordinance provides in pertinent part:

Upon the "Commencement of Operations" as defined in the Waste Handling Agreement, the Disposal of *any* Solid Waste generated within the municipality by any person or any place other than at this designated Facility or approved transfer station is prohibited, provided

Plaintiffs have also alleged that the City of Auburn and MMWAC conspired to restrain trade in the recycling area of the waste disposal business. As the court stated in *Fisichelli,* however, "in applying the "Parker immunity" doctrine, the courts should recognize no exception for "conspiracy...."" *Fisichelli,* 956 F.2d at 14. The City of Auburn is, therefore, entitled to state action immunity for its actions as alleged in Count I. *City of Columbia v. Omni Outdoor Advertising, Inc.,* — U.S. —, 111 S.Ct. 1344, 113 L.Ed.2d 382, *Fisichelli,* 956 F.2d at 14.[7]

■ Count I also seeks relief from MMWAC for its construction and enforcement of the flow control ordinance and waste handling agreement. The question arises then, whether MMWAC can be considered the equivalent of a municipality for purposes of applying the *Parker* doctrine. *See Interface Group, Inc. v. Massachu-*

*setts Port Authority,* 816 F.2d at 13. In its declaration of policy supporting the waste management law, the Maine Legislature recognized that municipal waste recycling and disposal facilities had not been developed well because of diffused responsibility among the overlapping units of local government. *Id.* § 1302. The Legislature also declared that sound environmental policy and economics dictate a preference for public solid waste management planning and implementation on a regional and state level. *Id.* To this end, Maine law permits and encourages the establishment of regional associations comprised of two or more municipalities "that have formed a relationship to manage the solid waste generated within the participating municipalities and for which those municipalities are responsible." *Id.* § 1303–C(24). As such a regional association, it is clear that MMWAC is the equivalent of a municipality for purposes of state law. *See In-*

however, the owner of any lot, or any other person with the permission of the lot owner may dispose or dump inert substances such as earth, rocks, concrete or similar material for fill purposes only.... (Emphasis added). Article IV, § 4.1.2 provides that certain materials may be excluded by the board by regulation, but there is no allegation that such regulation has been imposed. Therefore, the operative portion of the flow control ordinance requires the disposal of all solid waste at the designated facility.

7. The test to determine if state action immunity should be extended to private actors includes two parts: (1) whether defendants are acting in conformity with a clearly articulated state policy, and (2) whether there is supervision by the State of the defendant's challenged activity. Although both Plaintiffs and Defendants appear to believe that active state supervision is required for the municipality to avail itself of state action immunity, the Court does not find that to be a requirement.

In *Hallie v. City of Eau Claire,* 471 U.S. 34, 47, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985), the Supreme Court held that a municipality need not demonstrate that the state actively supervised its allegedly anticompetitive conduct in order to be eligible for state action immunity. The Court explained:

Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The

only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

The actions of which Plaintiffs complain in Count I include a conspiracy between Auburn and MMWAC. As will be shown *infra* in the text, MMWAC is not a private party either and is entitled to state action immunity in its own right. The Supreme Court made clear in *City of Columbia* that there is no conspiracy exception to the doctrine of state action immunity. *City of Columbia,* — U.S. at —, 111 S.Ct. at 1350–51, 113 L.Ed.2d at 394. Although the Court in *City of Columbia* alluded to a *possible* market participant exception to state action immunity, this Court does not think such an exception, if found to exist, would apply in this case. Although MMWAC participates in the waste disposal market, it is not acting as a private firm. *See Fisichelli,* 956 F.2d at 14. Rather, in setting up and operating the waste disposal plant, MMWAC is performing a police power function required of municipalities. These actions were impelled by State policy, and private market concerns were not a dominant purpose. *See Union Pacific Railroad v. United States,* 313 U.S. 450, 467, 61 S.Ct. 1064, 1074, 85 L.Ed. 1453 (1941) (cited by Court in *City of Columbia* as possible example of market participant exception).

terface Group, Inc. v. Massachusetts Port Authority, 816 F.2d at 13. MMWAC has the powers delegated to municipalities in Chapter 115 (section 2201 et seq.) of Title 30–A, of the Maine Revised Statutes, it has the power to issue bonds, notes and other debt obligations, and its board of directors are to be considered municipal officers. 38 M.R.S.A. § 1304–B(5). Since MMWAC has many of the attributes of a municipality and performs the waste disposal tasks required of the member municipalities to better effectuate state policy, it is entitled to state action immunity.

### B. Counts II, III, and III–A

■ In Count II Plaintiffs allege that MMWAC's contract with the Waste Management Defendants for the construction and operation of the transfer station extends MMWAC's statutory monopoly to the Waste Management Defendants by granting an exclusive right to those Defendants to receive, transport and dispose of waste delivered to the MMWAC facility during the term of the contract. The argument is that the contract gave the Waste Management Defendants an unfair advantage in its waste hauling enterprise because it was able to pay the reduced tipping fees negotiated under the contract.

As previously expressed, Maine law specifically allows municipalities to pass ordinances requiring delivery of all wastes generated within the municipality to a designated disposal or reclamation facility. 38 M.R.S.A. § 1304–B(2). Thus, municipalities are allowed to monopolize the disposal of their waste. Section 1304–B also specifically authorizes municipalities [8] to contract with a facility owner or operator for the disposal of the solid waste generated in the municipality. 38 M.R.S.A. § 1304–B(4). This authority to contract is granted in furtherance of the legislative policy to

"promote the recovery of resources from solid waste by creating one of the conditions which make energy recovery economically feasible, assuring municipalities the authority to guarantee a steady supply of solid waste to specific waste facilities." Id. The state policy governing waste management and the means for effectuating that policy are "clearly articulated and affirmatively expressed" in the Maine statute. See Interface Group, Inc. v. Massachusetts Port Authority, 816 F.2d at 13.

It was foreseeable from the structure of the state statutes that MMWAC would have a monopoly on trash disposal and that it might contract with only one other group, like the Waste Management Defendants, so that group would also have a monopoly of sorts. Since MMWAC can lawfully contract with any person, the persons with whom it might contract might reasonably be expected to deal in any aspect of waste management, including disposal and hauling, and can also include persons who subsequently go into the waste hauling business, as alleged here.[9] Thus, the alleged suppression of competition among waste haulers is the 'foreseeable result' of the contracts the state statutes authorize. See City of Columbia, —— U.S. at ——, 111 S.Ct. at 1350, 113 L.Ed.2d at 393. The foreseeability of the possible anticompetitive effects of contracts made by municipalities in furtherance of their waste disposal goals is plain from the statute itself. In section 1304–B(6), the Legislature explicitly exempted contracts made in accordance with subsection 1304–B(4) from being considered contracts in restraint of trade under the Maine Trade Regulations.

Although the complaint alleges a conspiracy between MMWAC and the Waste Management Defendants to extend the statuto-

---

8. The Court has not seen the actual interlocal agreement between the municipalities specifying the powers delegated to MMWAC under it. See 30–A M.R.S.A. § 2203. It is clear from the complaint and the contract attached to it, however, that MMWAC received from the municipalities the power to enter into waste handling agreements as contemplated in 38 M.R.S.A. § 1304–B.

9. In fact, under the statute MMWAC could have entered into a contract granting a monopoly for the "collection" and "transportation" of waste to the Waste Management Defendants. See 38 M.R.S.A. § 1304–B(4)(A).

rily-permitted monopoly to the waste hauling business, the Supreme Court made plain in *City of Columbia* that there is no exception to the state action immunity doctrine for conspiracy. *City of Columbia*, — U.S. at ——, 111 S.Ct. at 1350–51, 113 L.Ed.2d at 394. Defendant MMWAC, therefore, is entitled to state action immunity for the conduct alleged in Count II.

■ In Counts III and III–A, the gravamen of the anticompetitive activity complained of is that "MMWAC extended WMM's monopoly advantage outside the member communities after the MMWAC became operational in order to obtain critical fuel for plant operation." Plaintiffs' Memorandum in Opposition to Waste Management Defendants' Motion to Dismiss, at 5. Plaintiffs allege that a "sweetheart" contract between MMWAC and WMM granting a right to tip waste at a price below that offered other haulers has restrained trade in the extended market. Contracts such as that complained of by Plaintiffs are, however, contemplated by the statute. As previously stated, MMWAC is authorized by statute to contract with any person, such as WMM, "for the collection, transportation, ... or disposal of waste." In its findings and statement of purpose, the Legislature specifically found that

"[i]n order to remain cost effective throughout their lives, these energy recovery facilities require a guaranteed, steady supply of waste. Consequently, municipalities utilizing energy recovery facilities are usually required to enter long-term agreements to provide the facilities with specific amounts of waste. In order to make these energy recovery facilities financially feasible, and thereby

simultaneously improve the environmental impacts and the economics of municipal solid waste disposal, municipalities shall have the legal authority to control the handling of solid waste generated within their borders.

The purpose of this section is to promote the recovery of resources from solid waste by creating one of the conditions which make energy recovery economically feasible, assuring municipalities the authority to guarantee a steady supply of solid waste to specific waste facilities.

38 M.R.S.A. § 1304–B(1). In addition to establishing a policy of assuring that municipalities have a steady supply of solid waste at their disposal facilities, the statute also clearly contemplates that waste generated outside the borders of the municipality or interlocal group may be used to fill the need. *See id.* § 1304–B(4–A)(B).[10] Thus, the MMWAC's action in contracting with WMM for provision of waste generated outside the participating municipalities is "an authorized implementation of state policy." *Fisichelli*, 956 F.2d at 14.

Suppression of competition is clearly the foreseeable result of what the state statute authorizes. The decrease in competition which results when a contract is made with one party and not with others is "a logical and necessary outcome of the authority" to contract granted by the statute. *Id.* at 15 (quoting *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 769 F.2d 324, 329, *modified*, 774 F.2d 162 (6th Cir.1985)). When a contract is made with one person, clearly others are excluded. Thus, in granting broad contracting power to municipalities to fulfill state policies, the Legislature clearly foresaw the possibility that the contracts might restrict

---

**10.** Various portions of the Maine's waste management statute refer to the authority of municipalities to control waste generated within their borders. *See* 38 M.R.S.A. §§ 1304–B(1) and 1304–B(4); *Midcoast Disposal, Inc. v. Town of Union*, 537 A.2d 1149, 1151 n. 4 (Me.1988). Despite this express grant of authority, the statute also clearly contemplates that the municipality may have to procure and use solid waste from areas outside the participating municipalities in fulfilling the statutory intent. Section 1304–B(4–A)(B) provides that no contract for waste

disposal, transportation or handling services may prevent a municipality from meeting its obligations to supply minimum BTU or tonnage levels required by the contract by using waste generated outside its borders. By implication the Legislature clearly expected that municipalities, or their surrogates, might by the long-term contracts permitted them arrange to procure the steady stream of waste necessary to effectively implement the legislative solid waste policy from outside the municipality, as MMWAC has here.

**460**

competition. Again, this is particularly clear in this case since the statute exempts such contracts from operation of the state antitrust laws. 38 M.R.S.A. § 1304–B(6). Of course, even if the contract were entered into as part of a conspiracy between MMWAC and WMM, the state action immunity would still apply.[11] *City of Columbia,* —— U.S. at ——, 111 S.Ct. at 1350–51, 113 L.Ed. 2d at 394.

■■■ Determining that MMWAC is immune from suit on a state action theory is not the end of the inquiry, however, for Counts II, III, and III–A also seek relief from the Waste Management Defendants, which are private entities rather than municipalities. Like their co-defendants, the Waste Management Defendants have also asserted the defense of state action immunity. The test to determine if state action immunity should be extended to private actors includes two parts: (1) whether defendants are acting in conformity with a clearly articulated state policy, and (2) whether there is supervision by the State of the defendant's challenged activity. *See e.g. California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). The Supreme Court reaffirmed these requirements recently in *Federal Trade Commission v. Ticor Title Insurance Co.,* —— U.S. ——, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), making clear that the state supervision must be active. It has been established that the Waste Management Defendants actions are in conformity with a clearly articulated state policy. Plaintiffs argue, however, that state action immunity is not available to the private actors here because State supervision of their conduct is lacking.

In *Savage v. Waste Management, Inc.,* 623 F.Supp. 1505 (D.S.C.1985), a case similar to this one, the court addressed the issue whether the State must actively supervise the actions of a private party in order for that party to be eligible for state action immunity. Under South Carolina law counties, like municipalities in Maine, may assume responsibility for the collection and disposal of garbage and may issue to one or more persons the right to collect and dispose of garbage on such terms as they shall fix. The plaintiff in *Savage* argued that there was not adequate state supervision of the counties in carrying out state policy because there was no specific statutory guidance on how many refuse collectors or landfill operators there may be, how they should be selected and what rates should be charged. Plaintiffs argued, as Plaintiffs argued here, that the State had abdicated its supervisory role because state statutes entrusted supervision of enforcement of the state garbage policy to the counties.

The Court rejected the argument that active state supervision of the private defendants was necessary in the situation presented there:

> Section 44–55–1210 of the South Carolina Code, annotated, allows each county to collect and dispose of garbage itself or "contract with private agencies" to accomplish the job as their employees. It makes little sense to require *state* supervision of a contract between the county and a private party when no such supervision is required if the county does the work itself or hires private employees to do the work. This is a properly delegated local function of government which the county actively supervises.

*Savage,* 623 F.Supp. at 1511–12. A similar conclusion has been reached by numerous other courts. *See e.g., Gold Cross Ambulance v. City of Kansas City,* 538 F.Supp. 956, 966 (W.D.Mo.1982), *aff'd* 705 F.2d 1005 (8th Cir.1983) ("action of Kansas City in enforcing its ordinance ... constitutes active state supervision since its regulation of ambulance service is exercised under the authorization and direction of state policy"); *Tom Hudson & Associates, Inc. v. City of Chula Vista,* 746 F.2d 1370 (9th Cir.1984) (city supervises private party ade-

---

11. As described above in the text, MMWAC's alleged acts are properly delegated and undertaken pursuant to a clearly articulated state policy, so it need not show active state supervision in order to qualify for state action immunity. *Hallie v. City of Eau Claire,* 471 U.S. at 47, 105 S.Ct. at 1720 (1985).

quately when rates set are directly attributable to action of the city, not mere "acquiescence in an anticompetitive policy adopted on private party's initiative."); *Trinity Ambulance Service, Inc. v. G. & L Ambulance Service, Inc.*, 625 F.Supp. 142, 144 (D.Conn.1985), *aff'd* 787 F.2d 86 (2d Cir.1986).[12]

In this case, although the Court has not seen the actual contracts between MMWAC and the Waste Management Defendants, it is satisfied that MMWAC is exercising the supervisory function delegated to it. In the Waste Handling Agreements entered into with each of the municipalities, MMWAC promised that in performing the agreement, which it does by the contracts at issue here, it will not violate any provision of law, including the state waste management statutes. Waste Handling Agreement, Article II(A)(3), and I(B). In *Ticor* the Supreme Court explained that the reason for the active state supervision requirement is "to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, —— U.S. at ——, 112 S.Ct. at 2177, 119 L.Ed.2d at 423. As Defendants point out, when a private party contracts with a municipality or its surrogate, this concern is negligible when the activity complained of is necessary to the contract. Since MMWAC is performing the supervisory function through its contracts with the Waste Management Defendants, no further supervision by the State is required.

The Court finds, therefore, that the Waste Management Defendants are entitled to state action immunity on Counts II, III, and III–A. Since all the Defendants are immune from suit under the Sherman Antitrust Act for the actions alleged in

Counts I, II, III, and III–A, those counts should be dismissed.

## II. *Maine Trade Regulations*

■ Count IV alleges that actions of the Waste Management Defendants and MMWAC discussed above are in violation of Maine Trade Regulations, 10 M.R.S.A. §§ 1102, 1103, 1104, 1105, which prohibit contracts in restraint of trade, monopolies, conspiracies to monopolize, and contracts in restraint of trade in the handling of necessities. The Court has already determined that the Auburn flow control ordinance and the contracts entered into by Defendants, both of which provide the basis for Plaintiffs' allegations of conspiracies to monopolize and restrain trade, are authorized implementations of state policy. The waste management statute expressly addresses this issue: "No contract entered into in accordance with [38 M.R.S.A. § 1304–B] subsection 4 nor any ordinance adopted under the authority of subsection exempts contracts and ordinances entered into in accordance with [38 M.R.S.A. § 1304–B] subsection 2 may be deemed a contract in restraint of trade or otherwise unlawful under Title 10, chapter 201." Chapter 201 encompasses the sections upon which Count IV is based. Since the actions complained of may not be deemed to violate the Maine Trade Regulations, Count IV must be dismissed.

## III. *Civil Rights Claims and Equal Protection Claims*

### A. *Counts VI and VII*

■ In Count VI Plaintiffs seek relief against Defendant Auburn under 42 U.S.C. § 1983 for alleged violation of their constitutional rights. Specifically, Plaintiffs complain that the flow control ordinance and Auburn's enforcement of it against Plaintiffs in the Maine state courts consti-

12. In *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 774 F.2d at 163, *modifying* 769 F.2d 324, 329, the Court of Appeals for the Sixth Circuit, citing *Town of Hallie* and *Southern Motor Carriers Rate Conference, Inc. v. United States* [471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985)], but without further explanation, requires active supervision by the State of actions by a private entity even when that entity is engaged by a municipality. This Court agrees with the Court in *Vartan v. Harristown Development Corp.*, 661 F.Supp. 596, 601 (M.D.Pa.1987), *aff'd* 838 F.2d 1206 (3rd Cir. 1988), that the approach discussed in the text is the more appropriate one.

tute a taking of Tri–State's property without compensation and unconstitutional selective prosecution.

The Supreme Court addressed the issue raised here long ago. In two cases decided in 1905, private garbage collectors charged that new municipal ordinances establishing municipal waste disposal facilities and giving one company a monopoly over garbage collection effected a taking without just compensation and an interference with established property rights. *California Reduction Co. v. Sanitary Reduction Works*, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905); *Gardner v. Michigan*, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905). Noting the municipalities' police powers and the legislature's right to regulate under the police power even if the regulations interfere with private property rights without compensation, the Court held that municipal ordinances creating a monopoly over garbage collection "cannot be properly regarded, within the meaning of the Constitution, as a taking of private property for public use, without compensation, simply because such garbage and house refuse may have had, at the time of its destruction, some element of value for certain purposes." *California Reduction Co. v. Sanitary Reduction Works*, 199 U.S. at 323, 26 S.Ct. at 105. More recently, in *Hybud Equipment Corp. v. City of Akron, Ohio*, 654 F.2d 1187, 1188 (6th Cir. 1981) (*vacated on other grounds*, 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1981)), the Court of Appeals for the Sixth Circuit addressed issues almost identical to those raised here: "whether the City has violated either federal constitutional provisions or the antitrust laws by adopting a city ordinance monopolizing garbage collection and disposal and eliminating competition in the market for recyclable wastes." The court reaffirmed the holdings of *California Reduction* and *Gardner v. Michigan*, finding that "[t]he old cases are not anachronisms." *Id.* at 1193.

Plaintiffs argue incorrectly that municipalities have no statutory authority in Maine to control the disposal of solid wastes because the field has been preempted by the state by the Maine Hazardous Waste, Septage and Solid Waste Management Act. The Waste Management Act specifically states that "the State requires each municipality to provide for disposal services for domestic and commercial solid waste generated within the municipality." 38 M.R.S.A. § 1304–B(1). The Act also specifically authorizes the type of flow control ordinance and waste handling agreement at issue here to aid municipalities in carrying out this police power function.[13] *Id.* § 1304–B(2) and (4). The ordinance and agreement at issue here are clearly within Auburn's delegated police powers.

Plaintiffs also argue conclusorily that Auburn's exercise of the police power is unconstitutional because it has not acted in conformity with the Waste Management Act. The argument appears based on the allegation in the complaint that Defendant Auburn has impermissibly construed the Act to permit it to enact a flow ordinance which requires all waste, including recyclables, to be delivered to MMWAC for disposal. The Court has already found this argument to be without merit.

■ Plaintiffs have also alleged that although other waste haulers in the Auburn area have not delivered waste generated in the participating municipalities to MMWAC, Defendant Auburn has not sought to enforce the flow control ordinance against anyone other than Plaintiffs. Plaintiffs allege that such selective enforcement of the ordinance is unconstitutional. The Court of Appeals for the First Circuit has recently stated that

"[o]rdinarily, a claim of selective prosecution requires a showing that the challenged decision to prosecute had 'a discriminatory effect and that it was motivated by a discriminatory purpose.'" ... It must be shown that others similarly situated have not been prosecuted and that the decision to prosecute has been motivated by an impermissible reason.

---

**13.** In *Tisei v. Town of Ogunquit*, 491 A.2d 564, 570 (Me.1985), the Law Court refers to "the general police powers to control waste disposal."

*Willhauck v. Halpin,* 953 F.2d 689, 711–12 (1st Cir.1991) (*quoting Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)).

Although Plaintiffs here ·have alleged that others similarly situated have not been prosecuted, they have failed to allege motivation by an impermissible reason. The complaint alleges that the purpose of the state court action is

> to prohibit Tri–State from transporting any and all commercial waste to any disposal facility other than MMWAC whether or not such waste is useful and wanted by Tri–State for the recovery of the recyclable content and (b) the generator of the waste desires to cause the recovery of recyclable materials ... [and to] restrain trade by intimidating and coercing other waste haulers operating in the Participating Municipalities to deliver collected waste, including recyclable materials, to MMWAC ... and to cause all such haulers to comply with the ... flow control ordinances ... as interpreted and construed by MMWAC and the City of Auburn [and] to maintain and extend [Auburn's and MMWAC's] monopolies over the flow of waste in the Primary Market Area.

Complaint, ¶¶ 45–47. It alleges that the purpose of the prosecution is to drive Plaintiff out of the trash hauling business and for Auburn to acquire the business without compensation to Plaintiffs. *Id.* ¶ 128.

In *Wayte* the Supreme Court made clear that the type of impermissible motive which must be shown is one of constitutional dimension. Specifically, the decision to prosecute may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classifica-

tion, ... including the exercise of protected statutory and constitutional rights." *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531. Plaintiffs' complaint alludes to none of the traditional impermissible standards. Moreover, the Court has determined that the allegedly impermissible goals of which Plaintiffs complain are not to be considered unconstitutional takings or violations of the Sherman Antitrust Act. Plaintiffs have not only failed to allege an impermissible discriminatory purpose for enforcement of the flow control ordinance; they have failed to allege any impermissible purpose at all. Accordingly, Count VI must be dismissed.

Count VII, which alleges a violation of Plaintiffs' equal protection rights under the Constitution, also fails for the above reasons. *Willhauck v. Halpin,* 953 F.2d at 711–12.[14]

### III. *Other State Claims*

#### A. *Counts V and VIII*

Count V of the complaint alleges that Defendant MMWAC and the Waste Management Defendants have interfered with Plaintiffs' advantageous contractual relations in violation of Maine common law. The Maine Law Court has defined the alleged tort as follows: "The· law in Maine provides relief in damages, 'wherever a person, by means of fraud or intimidation, procures, either the breach of a contract or the discharge of a plaintiff, from an employment, which but for such wrongful interference would have continued.' " *MacKerron v. Madura,* 445 A.2d 680, 683 (Me.1982). The Court has found that actions by Defendants of which Plaintiffs complain are authorized by state statute and in furtherance of state policy and that the interference alleged was contemplated by the Legislature when it formulated the

---

**14.** The Court notes that Plaintiffs' § 1983 claim for injunctive relief for Defendants' alleged selective prosecution would be barred even if it had been appropriately pleaded. As the Court of Appeals stated in *Willhauck v. Halpin,* 953 F.2d at 711:

> An allegation that selective or vindictive prosecution has occurred in violation of due process should ordinarily be raised as a defense to such a prosecution. Once such prosecution had begun, a § 1983 action for injunctive relief to prevent the alleged violation of the due

process rights of the state defendant would be barred. *See Younger v. Harris,* 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971).

The enforcement action by Auburn and MMWAC against Plaintiffs, in which selective prosecution and many of the other claims raised by Plaintiffs in this action are being litigated, was decided adversely to Plaintiffs by Maine Superior Court on July 20, 1992. That decision is currently on appeal to the Maine Law Court.

legislation. Plaintiffs, therefore, have not alleged "wrongful interference," and Count V must be dismissed. *See* Keeton, Dobbs, Keeton, Owen, *Prosser and Keeton on Torts*, at 233 (5th ed. 1984).[15]

 Count VIII seeks relief against the City of Auburn for violation of Maine's Civil Rights Act, 5 M.R.S.A. § 4682, which provides relief for persons whose federal or state constitutional rights have been violated. Specifically, Plaintiffs allege the same violations of the United States Constitution addressed above. They further allege that Auburn's enforcement of its flow control ordinance and the operation of the ordinance operate as a taking of Plaintiffs' property without just compensation in violation of Article I, §§ 6-A and 21 of the Maine Constitution. As has been described, Auburn's actions do not constitute violations of the United States Constitution. The Law Court has made clear that the protections of section 6-A of the Maine Constitution and of the Fourteenth Amendment of the United States Constitution are declarative of identical concepts of due process. *Penobscot Area Housing Development Corp. v. City of Brewer*, 434 A.2d 14 (Me.1981). Thus, the Court's determination of the due process claim brought under the federal Civil Rights Act is determinative of the state claim.

Section 21 of Article I of the Maine Constitution expressly provides that no unconstitutional taking is effected when "public exigencies require it." The Court has determined under federal law that the City of Auburn was acting under the police power in enacting and enforcing the flow control ordinance and that its actions did not constitute an unconstitutional taking. The same analysis applies under state law, and the "public exigency" requiring municipalities to assume responsibility for waste disposal precludes Auburn's actions from being considered a taking under state law. Plaintiffs have failed to state a claim under the Maine Civil Rights Act, and Count VIII must be dismissed.

Accordingly, it is ORDERED that Defendants' Motions to Dismiss are hereby GRANTED on all counts and as to all Defendants.

SO ORDERED.

---

**15.** After addressing the relationship between the tort of negligence and compliance with statutory mandates, the treatise then discusses administrative regulation: "Where there is a normal situation, clearly identical with that contemplated by the statute or regulation, and no special circumstances or danger are involved, it may be found and can be ruled as a matter of law, that the actor has done his full duty by complying with the statute, and nothing more is required."