**CITY OF AUBURN, et al.**

v.

**TRI–STATE RUBBISH, INC.**

Supreme Judicial Court of Maine.

Argued Jan. 11, 1993.
Decided Aug. 5, 1993.

Nicholas S. Nadzo (orally), Jensen, Baird, Gardner & Henry, Portland, John W. Conway, Linnell, Choate & Webber, Auburn, for plaintiff.

Lucinda E. White, Asst. Atty. Gen., Augusta, Donna M. Katsiaficas, Portland, amicus curiae.

Ralph A. Dyer (orally), Law Offices of Ralph A. Dyer, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS and RUDMAN, JJ.

CLIFFORD, Justice.

Defendant Tri–State Rubbish, Inc. appeals from a summary judgment entered in the Superior Court (Androscoggin County,

Delahanty, C.J.) in favor of plaintiff City of Auburn and plaintiff-intervenor Mid–Maine Waste Action Corporation (MMWAC). The judgment enjoins Tri–State from violating a city ordinance requiring that all solid waste be taken to a location designated by the City, and provides for a civil penalty and damages in an amount to be established at a later hearing. Tri–State contends that the City has misconstrued the term "solid waste" in the ordinance and that the ordinance does not comply with state enabling legislation. It further asserts that the City's interpretation of the ordinance results in a violation of the commerce clause of the federal constitution as well as federal anti-trust laws, and effects a taking of Tri–State's property. Tri–State also contends that the ordinance as applied is an improper exercise of police power in violation of the constitutional due process and equal protection clauses. Although we are unpersuaded by most of Tri–State's contentions, we conclude that the court erroneously entered a summary judgment on the alleged violation of the commerce clause. Accordingly, we vacate the judgment and remand for further proceedings.

In 1986, the City entered into an agreement with MMWAC,[1] by which the City was obligated to send all solid waste generated in the municipality to MMWAC once MMWAC commenced operations. The agreement further required the City to adopt a flow control ordinance designating MMWAC as the disposal site for all solid waste generated in the municipality and provided that the City would not "repeal or amend such ordinance without the prior written consent of MMWAC." Under the agreement, which is to remain in effect for twenty-four years, the City is liable in damages for waste that is not delivered to the site.[2] The agreement further provides that neither party may terminate it for any reason whatsoever. The City thereafter adopted a flow control ordinance prohibiting the disposal of any solid waste at any location other than MMWAC.

Tri–State is a trash hauling corporation with a number of commercial accounts in Auburn. The president and principal shareholder is Guy Hart. Hart also owns and operates a recycling plant in West Paris (Recyclables Unlimited, Inc.). Hart estimates that his company picks up 3000 tons of material per year in Auburn and transports it to West Paris.[3] There the material is commingled with waste from other communities, and all of it is sorted for the purpose of separating recyclable materials that are ultimately sold.[4] The residual waste is generally transported to Maine Energy Recovery Company in Biddeford because its tipping fees are substantially lower ($35/ton as opposed to $75/ton at MMWAC), and because MMWAC will not accept refuse that has been commingled with refuse from nonmember communities.

The City filed a land use citation and complaint against Tri–State in the District Court (Lewiston). After the case was removed to the Superior Court pursuant to M.R.Civ.P. 76C,[5] the City filed an amended complaint seeking injunctive relief, a $100

---

1. MMWAC is a nonprofit corporation created by interlocal agreement. Twelve municipalities comprise its membership. MMWAC's statement of purpose declares that the corporation's purpose

> shall be to own, lease and operate a regional solid waste management program for the mutual environmental and civic benefit of its participating municipalities, and to exercise public powers and functions delegated by said participating municipalities....

MMWAC undertook to build a waste-to-energy facility in Auburn which became operational sometime during the course of these proceedings. Prior to its operation, MMWAC disposed of waste through a transfer station and agreement with Waste Management, Inc. to take the trash to its Rochester, New Hampshire dump.

2. The damages are set at 125% of the tipping fee per ton of waste. A tipping fee is the amount required to be paid to MMWAC for its handling of waste received at the site.

3. One-third of Tri State's revenue is derived from its Auburn accounts, and approximately one-half of the material collected by Tri–State in Auburn is recyclable material.

4. *See infra* Part IV, dealing with Tri–State's contentions that the ordinance violates the commerce clause of the United States Constitution.

5. In the Superior Court, MMWAC was granted leave to intervene as a plaintiff.

per day penalty for violation of the ordinance, and indemnification of the City for its liability to MMWAC. Tri–State's answer raised a number of affirmative defenses, including all of those that are at issue in this appeal.

In granting the City's and MMWAC's motion for a summary judgment, the court concluded that Auburn had enacted a valid ordinance pursuant to a specific grant of authority from the legislature. It found the ordinance's definition of solid waste to be clear and unambiguous and agreed with the City's interpretation that a business that has placed material in a trash container and pays for it to be hauled away has discarded it. The consequence of this conclusion is that all of the material Tri–State picks up in Auburn is solid waste that must be taken to MMWAC and not to the West Paris recycling facility. The court enjoined Tri–State from taking the material to any location other than MMWAC. It also ordered a further hearing on damages and a civil penalty. The court granted a stay of the injunction pending Tri–State's appeal.

## I.

The City's ordinance prohibits "the Disposal of any Solid Waste generated within the Municipality by any person or any place other than at [MMWAC]." City of Auburn, Solid Waste Flow Control Ordinance § 2.1. At the center of the present dispute is the construction of the term "solid waste," defined by the ordinance as:

> *useless, unwanted or discarded* solid material with insufficient liquid content to be free flowing, including by way of example, and not by limitation, rubbish, garbage, commercial and industrial waste, scrap materials, junk, refuse, demolition and construction debris and landscape refuse, but shall not include sludge from air or water pollution control facilities, septage tank sludge or agricultural or Unacceptable Waste.

Section 1.3.9 (emphasis added). Tri–State contends that material it collects from its commercial customers in Auburn is not useless, unwanted or discarded, and therefore is not solid waste, until Tri–State has separated recyclable items at its West Paris facility. To decide otherwise, according to Tri–State, is to grant the City and MMWAC a recycling monopoly. The City maintains, and the Superior Court determined, that once a business has placed material in a dumpster and has hired someone to remove that material, it is useless, unwanted or discarded, and thus has become solid waste subject to the ordinance. We agree with the Superior Court's construction of the ordinance.

■ Although the ordinance does not expressly state who makes the determination that solid material is "useless, unwanted or discarded," the only reasonable inference is that it is the *generator* of the material, i.e., the person or business that no longer wants or has any use for the material. Therefore, in deciding whether material constitutes solid waste that must be transported to MMWAC, the inquiry is whether the business entity, and not Tri–State, has any further use or plans for the solid material. When, as here, a company places material in a dumpster and hires someone to take it away, that action indicates the company has no further use for the material, and it becomes solid waste subject to the provisions of the ordinance.[6]

## II.

■ Tri–State next contends that the City's flow control ordinance is invalid be-

---

**6.** This interpretation of the ordinance does not necessarily lead, however, to the conclusion, commerce clause problems aside, *see infra* Part IV, that the City and MMWAC have complete control over all recycling in Auburn. Under the ordinance, *before* material becomes solid waste, the *generator* must decide it has no further use or plans for that material. When the generator decides to sell or donate one or more of its by-products to a recycler or some other organization, the solid material may not be "useless, unwanted or discarded" and therefore may not be subject to the flow control ordinance. There is nothing in the record before us, however, indicating that any Auburn business made a conscious decision to hire Tri–State because of Tri–State's recycling efforts; nor is it clear from the record that Tri–State's business customers have been charged lower fees because some of the solid material is recycled.

cause it does not comply with state enabling legislation. It argues that the ordinance fails to recognize that the legislature has given a higher priority to recycling than to incineration. We are unpersuaded by this argument.

The legislature has declared it is the policy of this state "to establish a coordinated statewide waste reduction, recycling and management program." 38 M.R.S.A. § 1302 (Supp.1992). To that end, the legislature first enacted a number of statutes relating to the management and disposal of solid waste, *see* 38 M.R.S.A. §§ 1301–1310–X (1989 & Supp.1992), and later added laws establishing recycling goals and programs. *See* 38 M.R.S.A. §§ 2131–2141 (Supp.1992). The City's authority to participate in MMWAC and to enact a flow control ordinance specifically derives from 38 M.R.S.A. § 1304–B, which allows a municipality, through an interlocal agreement, to participate in the ownership or operation of a waste facility and expressly authorizes a municipality to enact an ordinance requiring delivery of solid waste to a designated facility. After enacting section 1304–B, and after the City entered into its agreement with MMWAC and passed its flow control ordinance, the legislature established a goal, effective January 1, 1994, of recycling fifty percent of the municipal solid waste generated each year (38 M.R.S.A. § 2132) and made reduction of waste and recycling higher priorities than waste processing at trash-to-energy plants such as that operated by MMWAC. *See* 38 M.R.S.A. § 1302.

Contrary to Tri–State's contention, even though the legislature made section 1304–B "subject to the provisions of chapter 24" (the chapter on recycling) and the City now seeks to prevent Tri–State from transporting solid material to its recycling facility, this does not mean that the City ordinance does not comport with state enabling legislation. The legislature adopted an integrated approach to waste management that includes both waste disposal and recycling. The ordinance at issue here specifically addresses the waste disposal aspect of managing municipal waste.[7] It was enacted as part of the City's comprehensive plan, evidenced by its participation in MMWAC, to manage and dispose of waste generated within its borders. It does not violate state enabling legislation.

## III.

Tri–State also argues that the City and MMWAC have violated federal antitrust laws by conspiring to monopolize waste disposal in violation of section 1 of the Sherman Antitrust Act and by monopolizing waste disposal in violation of section 2 of that same Act.[8] This issue was recently addressed and decided adversely to Tri–State by the United States District Court for the District of Maine in a case involving these same parties and similar issues. *Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 803 F.Supp. 451 (D.Me. 1992), *aff'd in pertinent part*, 998 F.2d 1073 (1st Cir.1993). Assuming that collateral estoppel does not apply, *see Brown v. Osier*, 628 A.2d 125 (Me.1993), we agree with the federal district court that the City and MMWAC are entitled to state action

---

7. 38 M.R.S.A. § 1304–B(2) allows the *City* to designate certain materials as recyclable and exempt from the ordinance provision that all solid waste must be delivered to MMWAC, but the statute does not give *Tri–State* the authority to divert solid waste from MMWAC for this purpose. A *generator* of solid materials may arrange to recycle certain items and the decision to do so means that the items never become solid waste subject to the City ordinance. But when a generator merely discards recyclables along with other waste, the recyclables then become solid waste. In that circumstance, 38 M.R.S.A. § 1304–B(2) gives the *City*, but not Tri–

State, authority to remove recyclables from the waste stream. The authority to remove recyclables allows the City to comply with the state recycling policy without violating its flow control ordinance or its agreement with MMWAC. *See* 38 M.R.S.A. § 1304–B(4–A).

8. State antitrust statutes are not here implicated because the legislature has provided that waste handling agreements, such as the one entered into by the City and MMWAC, are not contracts in restraint of trade. 38 M.R.S.A. § 1304–B(6).

immunity with respect to the collection and disposal of solid waste.[9] *Id.* at 455–58. In reaching this conclusion, the federal court determined that MMWAC was not a private actor but has "many of the attributes of a municipality." *Id.* at 458. A municipality enjoys state action immunity when it has been given authority from the state to restrict competition in furtherance of implementing a particular state policy.[10] *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, ——, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991); *see also Fisichelli v. City Known as Town of Methuen,* 956 F.2d 12 (1st Cir.1992) (applying criteria set forth in *City of Columbia* ). In this case, the City's flow control ordinance was enacted pursuant to the state policy on waste management that specifically includes authority to adopt this type of ordinance. *See* 38 M.R.S.A. §§ 1302, 1304–B. Accordingly, the City and MMWAC are shielded from the federal antitrust laws by state action immunity.

### IV.

Finally, Tri–State argues that the City ordinance violates several provisions of the United States Constitution, including the commerce clause, the takings clause, the due process clause, and the equal protection clause.[11]

■ Tri–State's assertion that the ordinance violates the fifth amendment's prohibition against the taking of private property for a public purpose without just com- pensation is without merit. Although the Supreme Court of the United States has not recently addressed this issue, the court early this century upheld a city ordinance establishing a monopoly on trash collection. *California Reduction Co. v. Sanitary Reduction Works,* 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905). The Court said that the monopoly effected no taking "simply because such garbage and house refuse may have had, at the time of its destruction, some element of value for certain purposes." *Id.* at 323, 26 S.Ct. at 105. Accordingly, Tri–State's allegation that the ordinance's requirement ˙ that all solid waste, including recyclables, be transported to MMWAC effects a taking of its property must fail. *See also Hybud Equip. Corp. v. City of Akron, Ohio,* 654 F.2d 1187, 1192–94 (6th Cir.1981), *vacated on other grounds* 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982) (applying *California Reduction Co.* in a situation similar to that presented by this case).

■ Tri–State's assertions of a due process violation and an equal protection violation are similarly without merit. The ordinance satisfies the three criteria that due process requires.[12] *Tisei v. Town of Ogunquit,* 491 A.2d 564, 569 (Me.1985); *see also Peters v. Saft,* 597 A.2d 50, 53 (Me.1991). Nor do the facts support an allegation of selective prosecution in violation of the equal protection clause, because Tri–State has made no showing of a discriminatory or

---

**9.** Although the federal district court also discussed the monopolization of recycling, *see Tri–State Rubbish, Inc. v. Waste Management, Inc.,* 803 F.Supp. 451, 456 (D.Me.1992), we are not here presented with, and do not decide, the question whether the City and MMWAC are entitled to state action immunity should they attempt to monopolize recycling activities within the City. In this case, there is no allegation that generators of solid materials have been told they may recycle material only if they turn those materials over to the City and MMWAC. Here the only issue is whether Tri–State, a trash hauler, may divert recyclables from the City's waste stream.

**10.** The authority may be express or it may be a "foreseeable result" of what the state has authorized a municipality to do. *City of Columbia v.* *Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991).

**11.** U.S. Const. art. I, § 8, cl. 3 (commerce clause); amend. V (takings clause); amend. XIV (due process and equal protection clauses).

**12.** In *Tisei v. Town of Ogunquit,* 491 A.2d 564 (Me.1985), we explained the criteria used to determine if a municipal ordinance satisfies due process:
"1. The *object* of the exercise must be to provide for the public welfare.
2. The legislative *means* employed must be appropriate to the achievement of the ends sought.
3. The *manner of exercising* the power must not be unduly arbitrary or capricious."
*Id.* at 569 (quoting *State v. Rush,* 324 A.2d 748, 753 (Me.1974) (emphasis in original).

purposeful intent. *Aucella v. Town of Winslow,* 583 A.2d 215, 216 (Me.1990).

■ The challenge to the ordinance based on the commerce clause presents a more difficult question, however. Tri–State contends that the ordinance's requirement that all solid waste, including recyclable materials, be taken to MMWAC impermissibly burdens interstate commerce, because the ordinance prevents Tri–State from sorting recyclables at its West Paris facility and then selling those recycled materials in interstate markets.[13] We agree with Tri–State that the court erred in entering a summary judgment on this contention because there are genuine issues of material fact that remain to be addressed.[14]

■ The United States Supreme Court has made clear that a state or one of its subdivisions may not curtail the movement of articles of commerce either into or out of the state in order to advance its own economic interests. *Fort Gratiot Landfill v. Michigan Dept. of Natural Resources,* — U.S. —, 112 S.Ct. 2019, 2023, 119

L.Ed.2d 139 (1992). Solid waste is an article of commerce. *Id.* Likewise, recyclable materials are or may be part of the stream of commerce. A statute or ordinance that discriminates against interstate commerce is unconstitutional unless the discrimination is justified by factors unrelated to economic protectionism and there are no reasonable alternatives available.[15] *Id.* at —, 112 S.Ct. at 2023–34; *Maine v. Taylor,* 477 U.S. 131, 151, 106 S.Ct. 2440, 2454, 91 L.Ed.2d 110 (1986). On the other hand, a statute will receive less strict scrutiny if it regulates evenhandedly to further a legitimate local interest and its effects on interstate commerce are only incidental. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Then, the statute will be upheld unless the burden on commerce clearly exceeds the local benefits.[16] *Id. Fort Gratiot* teaches that because a statute purports to regulate only intrastate commerce and does not specifically mention or differentiate articles of interstate commerce, does not mean the statute is not discriminatory.[17] 112 S.Ct. at 2024–26.

---

**13.** The record does not indicate that Tri–State seeks to place residual trash in the interstate market. Accordingly, we do not decide whether the requirement that *all* trash be taken to MMWAC violates the commerce clause. *See, e.g., Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Auth.,* 814 F.Supp. 1566 (M.D.Ala.1993). We are here concerned only with the recycled materials that Tri–State wants to remove from the trash and place in interstate commerce.

**14.** The City and MMWAC contend that Tri–State failed to raise the commerce clause issue in the Superior Court and therefore did not preserve it for appellate review. Tri–State's answer to the City's complaint included the commerce clause as an affirmative defense. In addition, after the hearing on the City's and MMWAC's motion for a summary judgment but prior to the court's decision on the motion, Tri–State filed an application for further hearing, specifically mentioning the commerce clause and citing a United State Supreme Court case decided subsequent to the hearing. The court denied Tri–State's request. The commerce clause issue has been adequately preserved.

**15.** Discriminatory statutes have also withstood commerce clause scrutiny when it is determined that the state is a market participant, rather than a market regulator. *See, e.g., White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 214–15, 103 S.Ct. 1042, 1048,

75 L.Ed.2d 1 (1983). When the market-participant doctrine applies, the state may impose burdens only on the particular market in which it is a participant but may not impose conditions that have regulatory effects on other markets. *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 97, 104 S.Ct. 2237, 2245, 81 L.Ed.2d 71 (1984).

**16.** The Supreme Court has acknowledged that there is no bright line separating the cases receiving strict scrutiny from those in which the scrutiny is less strict. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986).

**17.** The statute struck down in *Fort Gratiot Landfill v. Michigan Dept. of Natural Resources* read, in relevant part:

A person shall not accept for disposal solid waste ... that is not generated in the county in which the disposal area is located unless the acceptance of solid waste ... that is not generated in the county is explicitly authorized in the approved county solid waste management plan.

— U.S. —, 112 S.Ct. 2019, 2022, 119 L.Ed.2d 139 (1992). In *Fort Gratiot* the Court also discussed a city ordinance it had previously struck down as discriminating against interstate commerce. That ordinance made it unlawful to sell

Moreover, the volume of commerce affected is not relevant to determining whether there is discrimination. Rather, the volume of commerce affected measures only the extent of the discrimination. *Wyoming v. Oklahoma,* —— U.S. ——, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992).

 The ordinance in this case discriminates against interstate commerce because it requires businesses such as Tri-State to take recyclable materials to MMWAC and prohibits trash haulers from marketing the recyclables in interstate commerce. Because the ordinance is discriminatory, the burden shifts to the City and MMWAC to show valid reasons for the ordinance other than economic protectionism and to demonstrate the unavailability of reasonable alternatives. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977) (burden to show discrimination rests on party challenging statute, but once discrimination demonstrated, burden shifts to state to justify regulation and to show unavailability of reasonable alternatives). Accordingly, the matter must be remanded to the Superior Court to provide the City and MMWAC an opportunity to introduce facts justifying the ordinance's provisions discriminating against interstate commerce as to recyclable materials, and demonstrating the unavailability of reasonable alternatives.[18] Because the. facts of this case require us to address only the removal of recyclables from the solid waste stream, leaving intact the requirement that nonrecyclable waste must be delivered to MMWAC, on remand, Tri-State must demonstrate that it has the capacity to separate the recyclables and deliver the remaining waste to MMWAC.[19]

Other contentions raised by Tri-State are without merit and require no discussion.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.

---

pasteurized milk in a particular city unless the milk had been processed at a plant located within five miles of the city. *Id.* at 2025 (citing *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951)). The Court explained that the fact that the ordinance discriminated against in-state processors as well as out-of-state processors "did not mitigate its burden on interstate commerce." *Id., see also Waste Sys. Corp. v. County of Martin, Minn.,* 985 F.2d 1381, 1386–87 (8th Cir.1993) (holding that ordinance requiring all municipal solid waste generated within county to be delivered to a particular facility discriminated against interstate commerce); *Waste Recycling, Inc. v. Southeast Alabama Waste Disposal Auth.,* 814 F.Supp. 1566, 1580 (M.D.Ala.1993) (holding that three municipal flow control ordinances similar to the one here at issue discriminated against interstate commerce).

18. MMWAC argues that the ordinance is necessary because the City needs to monitor the percentage of solid waste being recycled in order to meet the state's recycling goals. It is far from clear, however, that there are no other ways to monitor the quantity of materials being recycled, such as requiring licensed trash haulers to report to the City the amount of recyclable material they have collected.

19. Because this appeal followed the entry of a summary judgment, the factual record relating to the commerce clause is not fully developed. On remand, Tri-State should also demonstrate more specifically the interstate recycling markets affected.