TRI–STATE RUBBISH, INC., et al., Plaintiffs, Appellants,

v.

WASTE MANAGEMENT, INC., et al., Defendants, Appellees.

No. 92–2218.

United States Court of Appeals, First Circuit.

Heard Feb. 3, 1993.

Decided July 13, 1993.

Ralph A. Dyer, Portland, ME, for appellants.

Michael A. Nelson with whom Emily A. Bloch, Nicholas S. Nadzo and Jensen Baird Gardner & Henry, Portland, ME, were on brief, for appellee Mid–Maine Waste Action Corp.

Robert S. Frank with whom Carl E. Kandutsch and Verrill & Dana, Augusta, ME, were on brief, for appellees Waste Management, Inc., Waste Management of Maine, Inc., Consolidated Waste Services, Inc. and Consolidated Waste Transport, Inc.

John J. Wall, III with whom Thomas F. Monaghan and Monaghan, Leahy, Hochadel & Libby, Portland, ME, were on brief, for appellee City of Auburn.

Before BREYER, Chief Judge, TORRUELLA and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

The complaint in this case charged that a number of entities, public and private, were seeking to monopolize the waste disposal business and otherwise acting in violation of federal and state law. The district court

dismissed the complaint for failure to state a claim. 803 F.Supp. 451. We affirm the district court with one exception: as to the predation claims against the private defendants, we do not think that state action immunity has been made out on this record, and therefore remand those claims for further proceedings.

## I. THE BACKGROUND

This case is one of several in which state and local communities have taken measures to cope with their waste collection responsibilities, and private haulers have been adversely affected and responded with antitrust suits. The cases vary, and in this one the history is tangled and the claims numerous. In describing the facts, we take the allegations of the complaint as true, as is customary in reviewing dismissals for failure to state a claim. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993).

Maine has in force statutes that give local communities substantial authority over local waste collection and disposal. Under this legislative umbrella, the City of Auburn and eleven other municipalities formed in 1986 a non-profit, non-stock corporation to assist in waste disposal. The entity—Mid–Maine Waste Action Corporation ("MMWAC")— was then mandated to construct a facility to burn municipal waste and derive electricity from the process. Maine law expressly authorizes municipalities to cooperate in waste disposal projects, Me.Rev.Stat.Ann. tit. 38, § 2201, and provides ·for interlocal agreements to organize public waste disposal corporations to own or operate facilities. *Id.* § 1304–B(5).

MMWAC issued over $42 million in bonds to construct a waste-to-energy facility. The bonds were to be funded through so-called "tipping fees," customarily charged to those who dispose of waste at a landfill or other disposal facility, and through the revenues from the sale of the electricity. To secure the quantity of waste needed to operate the facility economically—that is, at a high percentage of its capacity—the MMWAC municipalities enacted flow control ordinances. These local laws, authorized by Me.Rev.Stat. Ann. tit. 38, § 1304–B(2), required the delivery of all solid waste generated within each municipality to MMWAC. Each municipality also contracted with MMWAC to deliver to it the solid waste generated in the community, paying MMWAC whatever tipping fee was required to produce revenues to service its debt.

Because the MMWAC incinerator-generator facility would not be ready before 1992, MMWAC provided in the meantime for an alternative method of disposing of the waste it received. For this interim period, MMWAC contracted with two related entities, Consolidated Waste Services and Consolidated Waste Transportation (collectively, "the Consolidated companies") to operate a transfer station near the MMWAC construction site. A transfer station is a collection point at which waste may be processed or repackaged before being sent to its final destination. MMWAC agreed to pay the Consolidated companies $66 per ton to receive the waste delivered and to dispose of the waste until the MMWAC incinerator was ready to operate.

MMWAC's initial tipping fee was set at $75 per ton. It is common in waste collection for municipalities to collect residential trash themselves or to contract out this function but to require commercial businesses to contract directly with private haulers for their trash removal facilities. Under the municipalities' agreements with MMWAC and under the local flow control ordinances, private trash haulers in the twelve municipalities and the municipalities themselves were effectively required to deliver their trash to the transfer station and pay the $75 per ton tipping fee to MMWAC.

Waste Management of Maine, Inc. is an operating subsidiary of Waste Management, Inc., one of the largest waste collection and disposal firms in the nation. The operating subsidiary provides trash collection in various Maine towns. In July 1990, after the transfer station agreement between MMWAC and the two Consolidated companies, Waste Management, Inc. acquired the two Consolidated companies; and one of the two may thereafter have been merged into Waste Management of Maine. We refer to

all four companies, collectively, as "Waste Management."

Tri–State Rubbish, Inc., a competitor of Waste Management of Maine, is also in the business of collecting and disposing of commercial trash, including waste generated by various customers in Auburn. Its affiliate, Recycling Unlimited Services Corp., Inc., processes waste and recovers from it recyclable commodities. Gary Hart is the principal in both businesses. In 1990, Tri–State Rubbish declined to deliver to the Consolidated transfer station all of the waste collected by Tri–State Rubbish in Auburn. Tri–State Rubbish's position was that waste capable of having recycled commodities extracted from it was not covered by the local flow control ordinance.

Auburn brought suit against Tri–State Rubbish in a Maine state trial court in December 1990 to enjoin it from refusing to deliver all of its Auburn waste to the transfer station. In July 1992, the court rejected Tri–State Rubbish's interpretation of Maine law and granted an injunction in favor of Auburn. *City of Auburn v. Tri–State Rubbish, Inc.*, No. CV–90–561 (Me.Sup.Ct., Androscoggin County, July 20, 1992). That case, we are told, is now on appeal to the Maine Supreme Judicial Court.

MMWAC's incinerator-generator began operating in early 1992 and almost at once MMWAC found that the waste produced in the twelve municipalities was not enough to keep the new facility operating at an optimal level. This led MMWAC to seek additional waste from outside the member towns; it did so by offering a reduced tipping fee, allegedly $45 to municipalities who were not members of MMWAC and as low as $28 to Waste Management of Maine for its delivery to MMWAC of waste collected outside the twelve communities. These reduced fees were not made available to Tri–State Rubbish.

In September 1992, Tri–State Rubbish, Recycling Unlimited, and Hart (collectively "Tri–State") began the present suit in federal

district court. The defendants were Auburn, MMWAC, and the four Waste Management companies: Waste Management, Inc., Waste Management of Maine, and the two Consolidated companies. Based on the events described above, the complaint asserted federal and state antitrust claims, a claim of tortious interference (by Waste Management) with Tri–State's contractual relations, and claimed violations (by Auburn) of 42 U.S.C. § 1983 and provisions of the U.S. Constitution.

The defendants in this federal action moved to dismiss the complaint under Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. The district court granted the motions, concluding that the antitrust claims were barred by so-called "state action" immunity; the bases for dismissing the other claims are more conveniently described below as the separate claims are discussed. *Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 803 F.Supp. 451 (D.Me.1992). This appeal followed.[1]

## II. THE FEDERAL ANTITRUST CLAIMS

A half century ago the Supreme Court determined, in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), that Congress had not intended the federal antitrust laws to apply to trade restraints or monopolies imposed by state governments. Although the antitrust laws aim at competitive markets, the Court in *Parker* recognized that governments often restrict competition for public purposes. The actions of state governments, no less than those of the federal government itself, were deemed not to fall within the constraints of the antitrust laws.

After a certain amount of wobbling, it has become settled that municipalities enjoy the protection of the *Parker* doctrine if, but only if, the conduct in question is of a kind authorized or directed by state law. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Fisichelli v. Town of Methuen*, 956 F.2d 12 (1st Cir.

---

1. Although both sides have captioned their briefs to show "Tri–State Rubbish, Inc., et al." as the plaintiffs-appellants, the notice of appeal names only Tri–State Rubbish, Inc. as the appellant.

Our caption and other references to Hart and Recycling Unlimited are without prejudice to any consequences that may flow on remand from the way the notice of appeal was framed.

1992). In general this immunity is not defeated by claims that the municipality "conspired" with a private party, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), or that the municipality made some error under local law. *Fisichelli*, 956 F.2d at 14.

*Count I.* In count I of its complaint, Tri-State contends that in violation of the Sherman Act, 15 U.S.C. §§ 1–2, Auburn and MMWAC have sought to monopolize and restrain trade in the waste disposal business in Auburn and the other eleven municipalities. The gist of the claim, as elaborated in Tri-State's brief, is simple: under the local ordinances, all solid waste generated in the twelve municipalities must be turned over to MMWAC or its designee. Thus the waste disposal business in these locations, including recyclable materials, is within the sway of one entity, MMWAC.

 With a couple of caveats, Tri-State concedes that state action immunity is available as to count I if the Maine legislature empowered municipalities to engross all solid waste including waste that might be recycled. But it argues that Maine's policy is to promote the recovery of recyclable commodities from waste before the residue is burned for electricity. It derives this priority from a declaration of policy in the Maine statute preceding the specific grants of authority. Me.Rev.Stat.Ann. tit. 38, § 1302, para. 2. It urges us to read the Maine legislation to exclude such recyclable waste from the authorization that allows municipalities to control the disposition of solid waste.

The Maine statute explicitly permits a municipality to require that "solid waste" generated within its boundaries be delivered to "a designated disposal or reclamation facility," *id.* § 1304–B(2), reclamation includes the generation of electricity, *id.*, and solid waste is defined to include "useless, unwanted or discarded solid material." *Id.* § 1303–C(29). The statutory definition of solid waste goes on to say that "[t]he fact that a solid waste or constituent of the waste may have value or other use or may be sold or exchanged does not exclude it from this definition." *Id.* This final clause pretty much disposes of Tri-State's argument.

Statutes or ordinances similar to those involved in this case exist elsewhere. Tri-State cites us to several that have been construed not to reach waste from which recyclable commodities could be extracted. Yet the case on which it principally relies concerned an authorizing statute that *excluded* recyclables.[2] By contrast, the definitional phrase in the Maine statute (quoted at the end of the last paragraph) explicitly includes recyclables in the waste that is subject to municipal control. The district court's reading of the Maine statute follows its plain language, 803 F.Supp. at 456, and comports with the reading of the Maine state court in the injunction action against Tri-State. *City of Auburn, supra.* We see no error in the district court's interpretation.

 Tri-State also objects to the district court's ruling that MMWAC should be treated as a municipality for state action purposes. As a private actor, Tri-State argues, MMWAC must show that it is subject to state supervision pursuant to *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). *Midcal*, building upon statements in *Parker* and later cases, made clear that state action immunity will extend to private actors only where they are subject to adequate official supervision. The state, in other words, may take anticompetitive measures itself or authorize its municipalities to do so; but it may not license *private* restraints unless the private parties are themselves regulated.

Passing the question whether the conduct challenged in count I is that of MMWAC (as opposed to the municipalities), we think that MMWAC's status is that of the municipalities. MMWAC's mission, waste disposal, is a

---

**2.** In *Waste Management of the Desert, Inc. v. Palm Springs Recycling Center, Inc.*, 9 Cal.App. 4th 368, 11 Cal.Rptr.2d 676, *petition for review granted*, 13 Cal.Rptr.2d 850, 840 P.2d 955 (1992), the California statute reserved the right of any-

one "to donate, sell or otherwise dispose of his or her recyclable materials" and of any private company to contract with a private waste hauler to remove segregated recyclable materials. 11 Cal.Rptr.2d at 683–84.

traditional local-government function. By statute MMWAC's directors must be elected by municipal officers and are themselves municipal officers. Me.Rev.Stat.Ann. tit. 38, § 1304–B(5). The full faith and credit of the municipalities may be pledged in aid of its operations. *Id.* Patently MMWAC is the creature of its member municipalities and enjoys their status. *See Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9, 13 (1st Cir.1987).[3]

*Counts II, III and III–A.* These counts, which include Tri–State's remaining federal antitrust claims, present a different set of issues. In count II Tri–State first challenged as a restraint of trade and attempted monopolization the agreement between MMWAC and the Consolidated companies. As a consequence of the interim arrangements, Tri–State argues that Waste Management of Maine was able to offer "predatory" prices to customers in Auburn and other MMWAC municipalities. In Tri–State's view, the $66 per ton payment by MMWAC to the Consolidated companies for disposing of the waste allowed their affiliate Waste Management of Maine effectively to reduce its $75 per ton tipping fee to $9 ($75 less $66) and thus steal away Tri–State's customers.[4]

Counts III and III–A concern the activities of Waste Management of Maine in other non-MMWAC communities. This competitor, says Tri–State, has been favored by MMWAC with a low tipping fee ($24 per ton), not available to Tri–State, for "foreign" waste delivered from outside the MMWAC municipalities to the new incinerator-generator.[5] As a result, Tri–State has lost customers outside the twelve municipalities to "low ball" prices. Further, the customers are "lock[ed] up" by exclusive dealing contracts

and supplied with trash containers that can be used only for Waste Management trash.

In analyzing these claims, the district court distinguished between MMWAC and the Waste Management companies. As to the former, the court pointed out that the participating municipalities were empowered by the Maine statute to control completely the collection and disposition of waste generated within their communities, dealing if they chose to do so with a single entity. 803 F.Supp. at 458; Me.Rev.Stat.Ann. tit. 38, § 1304–B(4). Thus, assuming that MMWAC's interim arrangements with the Consolidated companies favored the Waste Management companies over Tri–State, MMWAC was protected by the state action doctrine.

As to the conduct in Counts III and III–A, the district court noted that the Maine legislature clearly contemplated that municipalities could buy waste from other municipalities to make up any shortfall. 803 F.Supp. at 459; Me.Rev.Stat.Ann. tit. 38, § 1304–B(4–A)(B). A reduced tipping fee is merely one way of "buying" such waste. Nothing in the authorizing statute says that the same price must be offered to everyone; on the contrary the need for long-term fuel commitments, recognized elsewhere in the statute, *see* Me.Rev.Stat.Ann. tit. 38, § 1304–B(4), suggests that arrangements with one or a few suppliers were entirely foreseeable. We agree with the district court that MMWAC's alleged exclusive offer of the $24 tipping fee to Waste Management of Maine for foreign waste was authorized by statute and is protected by the state action doctrine.

A different, and more difficult, issue is presented by Waste Management's claim that it too is protected by the state action

---

**3.** The only participants named in count I are the municipalities and MMWAC. Since their conduct is authorized by statute, the state action doctrine applies. Contrary to Tri–State's claim, municipalities (or their instrumentalities) engaged in state-authorized conduct are not themselves required to be further supervised by the state. *See Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720.

**4.** Tri–State's assertion of a $9 per ton "net" tipping fee appears to be faulty economics. The $66 per ton payment to the Consolidated compa-

nies was to cover the cost of receiving and disposing of the waste. Whether or not the *cost* to the Consolidated companies was actually $66 per ton, it is not likely to have been zero.

**5.** The record does not explain why, given MMWAC's need for fuel, it would make sense for MMWAC to offer the $24 tipping fee exclusively to Waste Management of Maine. While we accept the allegation as true for purposes of this appeal, we note that MMWAC's brief denies that this is what happened.

doctrine. Tri–State objects that Waste Management, at least, is fully subject to the *Midcal* requirement that it be supervised before any of its actions can be protected. The district court agreed that supervision is required. But it found that municipal, as opposed to state, supervision is sufficient. It further held that this obligation was satisfied by MMWAC's obligation, undertaken in its contracts with its municipality members, to comply with all pertinent laws. 803 F.Supp. at 461.

■ We agree with the district court's view, supported by the greater weight of authority, that municipal supervision of private actors is adequate where authorized by or implicit in the state legislation. Although there is some precedent to the contrary,[6] we share the view of the Eighth and Ninth Circuits, endorsed by the leading antitrust treatise, that municipal supervision is adequate.[7] As Professors Areeda and Hovenkamp note, "it would be implausible to rule that a city may regulate, say, taxi rates but only if a state agency also supervises the private taxi operators." *Antitrust Law, supra* n. 7, at 197.

■ At this point, our analysis of Waste Management's position diverges somewhat from that of the district court. As to any claim that Waste Management received favorable tipping fees—whether through MMWAC payments to the Consolidated companies or outright as to foreign waste—we think "supervision" is not a requirement at all: the choice to make such payments was that of MMWAC and its actions are protected as state action. To treat the mere receipt of such authorized payments as wrongful would undermine the *Parker* protection afforded MMWAC and mistake the purpose of

the supervision requirement, which is to prevent the unregulated licensing of *private* anticompetitive conduct.

This analysis disposes of the claims under counts II and III against all parties including the Waste Management defendants, so far as those claims attack the official actions of MMWAC: the contract between MMWAC and the Consolidated companies, the payments to the Consolidated companies by MMWAC, and the tipping fees set by MMWAC for Waste Management of Maine, whether for local or foreign waste. It does not, however, resolve the attacks, scattered throughout counts II, III, and III–A against the conduct of Waste Management of Maine vis-a-vis its own customers. These attacks charge Waste Management of Maine with predatory pricing of its waste collection services, wrongful exclusive dealing by long-term contracts, and unreasonably restricting the use of the containers it furnished.[8]

■ *The Predation Claims.* The district court held that the Waste Management defendants were protected as to their customer-related conduct under the state action doctrine. The court reasoned that by its agreements with the municipalities, MMWAC had committed itself to obey the law; that Waste Management of Maine had contractual arrangements with MMWAC; and that this contractual authority provided sufficient municipal supervision to cast the garment of *Parker* protection over Waste Management of Maine's own conduct. 803 F.Supp. at 461. The district court noted, however, that the contracts had not been made available to it for inspection. *Id.* We are not persuaded that the rates and contract terms Waste Management set for its own customers have been brought within *Parker*.

---

**6.** See, e.g., *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.,* 774 F.2d 162 (6th Cir.1985).

**7.** *Gold Cross Ambulance & Transfer v. City of Kansas City,* 705 F.2d 1005 (8th Cir.1983), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *Tom Hudson & Assocs. v. City of Chula Vista,* 746 F.2d 1370 (9th Cir.1984), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985); *Savage v. Waste Management, Inc.,* 623 F.Supp. 1505 (D.S.C.1985); see

*also* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 212.7c at 196–97 (Supp.1992).

**8.** MMWAC is also charged in these counts but, apart from bare references to conspiracy, there is nothing in the complaint to connect MMWAC with Waste Management's actions vis-a-vis its own customers except the favorable tipping fees. Since the fee payments are state action, we do not think that any claim has been stated against MMWAC based on Waste Management's alleged predation.

There is simply nothing to which we have been pointed to show that MMWAC has claimed or exercised any control whatever over the rates that Waste Management of Maine charges to its customers or the other terms (such as length of contract) on which it deals. While it is conceivable (but not proved) that MMWAC claims such authority with respect to customer contracts in the MMWAC communities, it is certainly less likely that it does so in the non-MMWAC communities which are the locales for the predation alleged in counts III and III–A. Absent a showing of control, questions of state authorization and the adequacy of official supervision need not even be reached.

 It is a close question whether the judgment of dismissal should nevertheless be affirmed on an alternative ground, namely, that the allegations of the complaint fail to state a predation claim even if the state action doctrine is ignored. This alternative course is urged by Waste Management, and we have given it serious consideration. The requisites for proving predatory pricing are demanding, because the conditions under which it is plausible are not common, and because it can easily be confused with merely low prices which benefit customers. *See Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983). Exclusive dealing contracts may also benefit customers and are unlawful only upon a particularized showing of unreasonableness. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Thus a complaint that did no more than allege predatory pricing or exclusive dealing contracts with *nothing* more specific might well be susceptible to dismissal for failure to state a claim. The present complaint is, in a sense, both better and worse. It is somewhat more specific, asserting at one point that the prices offered by Waste Management of Maine were as much as 50 percent below market rates, at other places that the rates were sometimes below variable cost, and that the exclusive dealing contracts were for three years.

At the same time, the complaint goes some distance toward undermining its own predatory pricing claim. Tri–State implies that the low prices offered by Waste Management of Maine were, in some instances at least, the result of the favorable tipping fees that MMWAC made available to it. If this is the whole of the charge, then there is no predatory pricing claim at all. A company that rationally prices its own product or service at or above its own costs does not violate the Sherman Act merely because its costs, and thus its prices, are lower than a rival's costs; and this is true even though its lower costs may be due to the generosity, or foolishness, of another supplier who has charged the company too little for an input. *See generally Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, — U.S. —, —, 113 S.Ct. 2578, 2584, 125 L.Ed.2d 168 (1993).

Even apart from this possible explanation for lower prices, Tri–State's predatory pricing claim is on the edge of inadequacy. Although the complaint asserts that Waste Management is pricing below variable cost— the normal test of predation, *see Barry Wright*—it is not clear what basis if any Tri–State has for this assertion. The reference to prices 50 percent below customary prices might invite some suspicion, but in an industry like waste collection, in which customers are scattered along routes, the variable cost of serving additional customers to piece out a route may be extremely low.

The claim that the duration of the exclusive contracts is unlawful is, if anything, an even thinner case on the face of the complaint. That some of the contracts are three years, the only specific in the complaint, might invite curiosity, but it does not even begin to establish illegality. Under *Tampa Electric Co.*, it is the totality of reasons for such a term, and its actual impact on competition, that are decisive. Here, we know nothing about the number of customers affected, the size of any cancellation penalty, the practice in the industry, or anything else that might help to paint a picture of the competitive scene. Of course, a plaintiff is required only to plead a claim, not to recite evidence, but the essence of a claim like this one lies in the details.

 A final concern is that predatory pricing is a section 2 claim and is condemned

only where it is part of an attempt to monopolize or is used to secure or retain an actual monopoly. *E.g., C.A.T. Industrial Disposal, Inc. v. Browning–Ferris Industries,* 884 F.2d 209 (5th Cir.1989).[9] Tri–State certainly does allege both the aim of monopoly and the actuality, but its complaint supplies very little information (*e.g.,* market shares in a properly defined market) from which one can frame a judgment whether this claim is plausible. The complaint does say that Waste Management, Inc. and its subsidiaries are the largest waste handling and disposal business in Maine and in the nation; but the primary issue is dominance or prospective dominance in a properly defined economic market.

One's first instinct is that monopoly would be hard to sustain in a business in which the basic equipment is a truck and entry is apparently easy. *See generally United States v. Waste Management, Inc.,* 743 F.2d 976 (2d Cir.1984). But waste collection might in theory be subject to local monopoly in some circumstances. Thus, the efficiencies of collecting from a number of closely located customer sites could make new entry difficult, especially if the community were small and many customers were tied to an existing dominant hauler by long-term contracts; and environmental restrictions on new landfills in some areas could give a decisive advantage to a hauler that controlled the only available facility. There are some hints, but only hints, in the complaint that Waste Management of Maine may enjoy an advantage of this latter sort.

Taking everything together, we think it wiser not to affirm the dismissal of the predation claims on the alternative ground. Thin and doubtful though they may be, we cannot say at this stage that these claims are hopelessly inadequate if *Parker*'s shield is removed. The district court did not rest its decision on that ground, and it has been the subject of only a small portion of the briefs on this appeal. The old prejudice against summary disposition of antitrust claims has diminished, *First National Bank v. Cities Services Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), but the grant of a Rule 12(b)(6) motion on the predation claims would, at least at this time, be a shade too summary.

We underscore the limited nature of our remand. These claims can be stated, if at all, only against the Waste Management defendants. The district court is fully entitled to demand more specific explanations from Tri–State as to the gray areas in its predation claims, including the basis for the charge of pricing below variable cost, the basis for the market definitions urged, and the basis for any claim that monopoly power exists or could plausibly be secured in a properly defined economic market. Nothing in this opinion is intended to preclude summary disposition at a later stage, and this need not mean much later if these claims prove to have little substance.[10]

## III. TRI–STATE'S REMAINING CLAIMS

Count IV of the complaint reasserts, under the Maine antitrust statute, the federal antitrust claims made in the earlier counts. The Maine antitrust statutes parallel the Sherman Act, *see* Me.Rev.Stat.Ann. tit. 10, §§ 1101 *et seq.,* and Tri–State offers no separate argument for liability under state law. In point of fact, the Maine statute under which MMWAC is organized also has an explicit exemption from state antitrust laws for specified municipal contracts or ordinances. Me.Rev.Stat.Ann. tit. 38, § 1304–B(6). Accordingly, the dismissal of the state antitrust claim is sustained except as to the predation claims against the Waste Management defendants.

---

9. Exclusive dealing, which can be attacked *inter alia* under section 1 of the Sherman Act, 15 U.S.C. § 1, can be condemned without a showing that monopoly power is present or within reach. But the impact on competition is part of the equation and, absent a potential monopoly or oligopoly, the competitive impact may be hard to establish.

10. The Waste Management defendants are also free to pursue their *Parker* defense as to the predation claims. Our holding is that on this record there is an insufficient basis for determining that *Parker* immunity exists as to the terms on which Waste Management of Maine deals with its customers.

In count V, Tri–State claims that the solicitation of Tri–State customers by Waste Management of Maine was a violation of Maine law against interference with advantageous contractual relations. The gravamen is that this solicitation was unlawful because achieved through discriminatory tipping fees, predatory pricing, and other wrongs. The district court dismissed the count on the ground that the actions in question were within the ambit of the state legislation and therefore could not be "wrongful interference." 803 F.Supp. at 463–64. In this court, Tri–State does not argue the claim at length, asserting instead that its tortious interference claim is "contingent" upon our finding that the alleged anticompetitive conduct enjoys no immunity.

We think the fixing of tipping fees by the municipalities and MMWAC is embraced by the Maine statute—Tri–State makes no effort to show the contrary—but, as earlier stated, we cannot find on this record that the terms on which Waste Management of Maine dealt with its own customers has been the subject of regulation. Accordingly, count V, so far as it makes allegations against the private defendants based on Waste Management of Maine's dealings with its own customers, is remanded for consideration together with the predation claims. Nothing in the complaint explains why MMWAC is responsible for such contracts, however, and as to it the dismissal of count V is sustained for failure to state a claim.

Count VI of the complaint asserts a claim under 42 U.S.C. § 1983 against Auburn. In part, this count says that the *City of Auburn* injunction action against Tri–State represented discriminatory prosecution in violation of due process principles. Count VII makes the same complaint based on equal protection principles. Count VIII, the final count of the complaint, re-asserts the allegations of counts VI and VII as violations of Maine's own civil rights statutes. Me.Rev.Stat.Ann., tit. 5, §§ 4682–83. On appeal, Tri–State advises that it elects not to press the selective prosecution issue in this court, reserving it for its state court appeal.

This leaves only Tri–State's final contention—the other subject of its count VI claim—that the Auburn flow control ordinance is "an unconstitutional taking of [Tri–State's] property without compensation." Tri–State's theory seems to be that the Auburn flow control ordinance has crippled Tri–State's waste disposal business. This, says Tri–State, is a business in which it has engaged for many years and its interests in continuing without undue interference deserve protection as "investment-backed expectations." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

While the Supreme Court did use the quoted phrase to describe a pertinent consideration in takings cases, the *Penn Central* opinion actually reaffirms that government for public purposes can, without compensation, impose general regulations that may severely limit the value of an ongoing business. The Supreme Court has in fact twice upheld municipal ordinances granting one waste collector the exclusive right to collect and dispose of waste within the community, putting existing haulers out of business.[11] Despite Tri–State's claims that these cases are outdated, nothing in the Supreme Court's more recent decisions raises serious doubts about their validity. The Sixth Circuit has rejected an argument almost identical to Tri–State's. *Hybud Equipment Corp. v. City of Akron,* 654 F.2d 1187 (1981), *vacated on other grounds,* 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982).

\* \* \*

In this case, we have concluded that, with the possible exception of its predation claims against the private defendants, none of Tri–State's claims has any merit. This does not mean that there is no basis for Tri–State's concerns about the competitive impact of the MMWAC arrangements, or for its assertion that the plan is unfair to it or bad for recycling. But government action may be anticompetitive, unfair or unwise without being illegal. Absent illegality, the solution lies with the legislature and not in the courts.

---

**11.** *See California Reduction Co. v. Sanitary Reduction Works,* 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905); *Gardner v. Michigan,* 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905).

The judgment of the district court is *affirmed* except for the dismissal of the federal and state antitrust claims in counts II–V and the tort claim in count VI insofar as those counts charge the Waste Management defendants with predation or related anticompetitive conduct toward customers. Those claims are *remanded* for further proceedings in accordance with this opinion. No costs.

*It is so ordered.*