TRI–STATE RUBBISH, INC., Plaintiff,

v.

WASTE MANAGEMENT, INC.,
et al., Defendants.

Civ. No. 92–122–P–C.

United States District Court,
D. Maine.

Oct. 31, 1994.

Ralph A. Dyer, Portland, ME, for plaintiff.

Robert S. Frank, Carl E. Kandutsch, Verrill & Dana, Portland, ME, for defendants.

## MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

In this action, Plaintiff Tri–State Rubbish's (TSR) Amended Complaint seeks damages from Defendant Waste Management, Inc. and Waste Management of Maine (collectively referred to as WMI), alleging violations of section 2 of the Sherman Anti–Trust Act, 15 U.S.C. § 2 (Counts I and II), Maine antitrust law, 10 M.R.S.A. §§ 1105, 1102 (Count III), and a common law claim for alleged tortious interference with contractual relations (Count IV). Specifically, Plaintiff's antitrust claims seek relief for alleged use of "predatory pricing" and exclusive contracts in an effort to gain a monopoly position in the relevant market area.[1]

---

1. This Court previously dismissed all counts of Plaintiff's Complaint for failure to state a claim. *Tri–State Rubbish v. Waste Management*, 803 F.Supp. 451 (D.Me.1992). The United States Court of Appeals for the First Circuit affirmed the decision with respect to Defendants Mid–Maine Waste Action Corporation (MMWAC) and the city of Auburn, but remanded the remaining counts, permitting this Court "to demand more specific explanations from Tri–State as to the gray areas" in its claims for relief against Waste Management, Inc and Waste Management of Maine (collectively referred to as WMI). *Tri–State Rubbish v. Waste Management*, 998 F.2d 1073 (1st Cir.1993). Thus, WMI is the only remaining Defendant in this litigation.

Defendant WMI seeks summary judgment on all remaining counts of Plaintiff's complaint contending that there is no genuine issue of material fact as to whether Defendants violated federal and state antitrust laws or Maine common law. After careful review of the pleadings and discovery submitted by the parties, this Court finds that there is no genuine issue as to any material fact and that Defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The Court of Appeals for the First Circuit has articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. *Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989). In order to evaluate WMI's motion, the Court must review the record evidence in the light most favorable to the nonmoving party, TSR, drawing therefrom such inferences as are favorable to TSR. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157–58, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). A brief statement of the facts to which there is no genuine issue of material fact follows.

## I. MATERIAL FACTS

The parties are competitors in the business of hauling solid waste. Plaintiff TSR was incorporated in 1989, with its president and sole stockholder, Guy Hart, having been involved in the waste hauling and disposal business since 1972. The waste hauling services provided by TSR include supplying large waste disposal containers to commercial customers and periodically hauling the waste from these containers to disposal and recycling facilities. The parties are in agreement that the relevant geographic market for the purposes of summary judgment includes the twelve Maine towns that are members of the Mid–Maine Municipal Waste Action Corporation[2] (MMWAC) and Lewiston, Maine. In the relevant geographic market, Auburn and Lewiston have the greatest number of potential customers. In 1990, prior to the entry of WMI to the market, TSR had approximately a 49% share of the market.

WMI is a subsidiary of one of the largest waste collection and disposal companies in the country. WMI provides similar waste collection and disposal services and owns a

---

2. MMWAC is a nonprofit, nonstock corporation created pursuant to an interlocal agreement and Maine law which encourages municipalities to cooperate in waste disposal projects. 38 M.R.S.A. § 2201. The entity was created to construct and operate a trash-to-energy facility to dispose of the member towns' waste. *See, Tri–State Rubbish,* 998 F.2d at 1075. The MMWAC member towns are Auburn, Monmouth, Sweden, Minot, Poland, Sumner, Wales, Buckfield, Bowdoin, Lovell, New Gloucester, and Raymond.

waste disposal facility which, at one time, was used by all member municipalities of the Mid–Maine Waste Action Corporation pursuant to the towns' flow control ordinances. In its Complaint, TSR estimates that, as of November 1993, WMI had acquired a 30% share of the relevant market, and TSR's share had been reduced to 20%. In addition, several other firms have entered the market in recent years. During the years 1990 to 1993, the period of the alleged anticompetitive conduct, TSR had approximately 250 commercial customers in Auburn and between 125 and 200 customers in Lewiston.

TSR alleges that WMI intentionally undervalued the cost of its waste disposal services to prospective customers when quoting a price by using an average industry weight of 85 pounds per cubic foot to each customer, rather than by determining the actual cost based upon an estimated weight obtained from the particular customer. Recently, however, WMI installed scales directly on its trucks so that it can accurately determine the weight of the waste being hauled. Use of these scales demonstrated that some accounts admittedly had been underestimated and prices were raised. WMI was able to offer competitive prices in part because of the reduced tipping fees (the amount charged by waste disposal facilities when waste is presented by haulers) it enjoys when bringing waste to the MMWAC facility. Representatives of TSR and the other haulers in the market state that they are unable to compete with WMI since the latter's *prices* are lower than the *costs* of the other haulers.

It is also alleged by TSR that some of WMI's customers signed exclusive-dealing contracts for up to three-year periods, under which they would be subject to liquidated damages equivalent to six months' hauling fees in the event they terminate the contract prematurely. Finally, there are also allegations that WMI employees made statements to prospective customers to the effect that TSR was engaged in criminal activity and that it was going out of business.

## II. DISCUSSION

### A. The Predatory Pricing Claim

Plaintiff claims that WMI has engaged in "predatory pricing" tactics in violation of section 2 of the Sherman Anti–Trust Act.[3] In order to establish a cognizable claim under this provision, Plaintiff has a substantial burden to demonstrate with specific facts: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ——, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247, 257 (1993). The Supreme Court has emphasized that the aim of the Sherman Anti–Trust Act is to protect, not punish, competitive activities and has noted that "[i]t is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects." *Id.* at ——, 113 S.Ct. at 892, 122 L.Ed.2d at 258. It is not enough for an antitrust plaintiff to merely demonstrate that a defendant has the intent to gain a monopolistic control; the plaintiff must also show a *dangerous probability* that the defendant will succeed. This question requires analysis of the "relevant product and geographic market and the defendant's economic power in that market." *Id.* ——, 113 S.Ct. at 892, 122 L.Ed.2d at 259.

Further, if the allegations of a section 2 violation stem from alleged predatory pricing, the Supreme Court requires additional facts to make out a claim. First, Plaintiffs must be able to prove that "the prices complained of are below an appropriate measure of its rival's costs."[4] *Brook Group, Ltd. v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, ——, 113 S.Ct. 2578, 2587, 125

---

3. The federal statute provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

4. There is conflict among the circuits as to the relevant measure of a defendant's costs. *Brook Group, Ltd. v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, —— n. 1, 113 S.Ct. 2578, 2587 n. 1, 125 L.Ed.2d 168, 186 n. 1. The First Circuit follows a "variable cost" approach. *Tri–State Rubbish,* ·998 F.2d at 1080.

L.Ed.2d 168, 186 (1993). Second, Plaintiff must demonstrate a dangerous probability that Defendant will recoup the investment in below-cost prices. *Id.* at —, 113 S.Ct. at 2588–89, 125 L.Ed.2d at 187.

The discovery submitted to this Court by Plaintiff documents a highly competitive market for trash in the area at the focus of this motion, but no anti-competitive conduct. As the United States Court of Appeals for the First Circuit observed recently, "Heavy-handed competitive tactics alone do not constitute an antitrust violation." *R.W. Intern. Corp. v. Welch Food, Inc.*, 13 F.3d 478, 487 (1st Cir.1994). This is consistent with the purposes of antitrust legislation:

> The purpose of the [Sherman Antitrust] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

*Spectrum Sports, Inc.*, — U.S. at —, 113 S.Ct. at 891–92, 122 L.Ed.2d at 258.

■ The First Circuit observed that TSR must demonstrate that WMI was pricing below its *own* costs, not merely those of its competitors. *Tri–State Rubbish*, 998 F.2d at 1080. TSR was unable to gain any evidence from WMI that WMI intentionally priced its hauling services under its own costs in order to gain new accounts. The mere fact that WMI's operations in parts of Maine were, at times, unprofitable does not alone permit an inference of deliberate anticompetitive conduct. *See Brook Group*, — U.S. at —, 113 S.Ct. at 2588–89, 125 L.Ed.2d at 187. The affidavits submitted from the other haulers in the relevant market are irrelevant to the issue of WMI's actual costs.

Even aside from the matter of below-cost pricing, TSR has not demonstrated that WMI presents a dangerous probability of gaining a monopoly stronghold on the relevant market. The facts indicate that WMI has made an impressive entry into the market and, no doubt, has taken several accounts away from its competitors. That is competi-tion—not anticompetition. Moreover, the market has continued to enjoy competition even with the presence of WMI for the past four years. Small haulers remain in business, and there is no indication that the number of accounts lost by TSR to WMI are in any way threatening the future of TSR. Assuming that TSR's numbers are correct, TSR and its primary competitor in the past, Andy Valley Refuse Disposal, formerly shared the market between them equally. The market is now far more diversified, with WMI at a 30% share and TSR, Andy Valley, and Great Northern Paper at shares of 20% each. The remaining 10% of the market is divided among six other haulers.

Finally, the deposition testimony of a former WMI truck driver as to statements allegedly made by management personnel regarding attempts to gain a foothold in the Lewiston area market is insufficient, standing alone, to demonstrate intentional predatory pricing or other anticompetitive conduct. *Brook Group*, — U.S. at —, 113 S.Ct. at 2588–89, 125 L.Ed.2d at 187. In short, at the conclusion of discovery in this case, TSR is still unable to point to any indications that WMI actually engaged in any conduct having the real potential to injure *competition.*

### B. The Use of Exclusive Contracts

■ Plaintiff also claims that WMI's use of three-year exclusive-dealing contracts is in violation of section 2 of the Sherman Act. The primary guidance on this issue derives from *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), in which the Supreme Court held with reference to section 3 of the Clayton Anti-Trust Act:

> In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate this section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.

*Id.* at 327, 81 S.Ct. at 628. In other words, the Court declined to adopt a *per se* rule of the lawfulness of such contracts, and courts instead must apply "a rule of reason." *Bar-*

*ry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir.1983). The rationale of *Tampa Electric* has been applied to analyses of exclusive-dealing contracts under section 2 of The Sherman Act as well. *See, e.g., Barry Wright*, 724 F.2d at 236–37. The First Circuit has evaluated such contracts by examining "the nature of the contracts and the market, their fairly short time period,[5] their business justifications, the characteristics of the parties, and their likely motives as revealed by their business interests." *Id.* at 238. While this standard clearly requires an analysis of facts offered by the parties, the Plaintiff has not presented evidence on the motion that reaches even a minimal showing of how these contracts present a "dangerous probability," as required by section 2, of monopolization of the trash-hauling market. At the conclusion of discovery in this case, Plaintiff has not demonstrated any potential injury to competition from WMI's practices.

The First Circuit was extremely skeptical that this count could survive summary judgment absent a more specific showing. ("[T]he essence of a claim like this one lies in the details." *Tri–State Rubbish* ) 998 F.2d at 1080. *Tri–State Rubbish*, 998 F.2d at 1081. The First Circuit held recently, "Absent a compelling showing of foreclosure of substantial dimensions, we think there is no need for us to pursue any inquiry into [Defendant's] precise motives for the [exclusive-dealing] clause." *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir.1993). It is at this preliminary stage that Plaintiff's allegations fall short.

▮▮▮ As with the predatory pricing issue, there may be little question that these contracts affected competition as the affidavits of WMI's competitors state, but gaining an advantage over your competitors is not, in itself, a violation of antitrust laws. Plaintiff has failed to show the extent of any impact of these contracts. It is unclear, for example, how many customers actually signed these contracts and whether they are given any incentive to do so (*i.e.* frozen prices, a free month of disposal, etc.). It is possible that such contracts may benefit WMI's customers. As the Supreme Court has held repeatedly, absent a showing of actual threat of injury to competition, Plaintiff's claim cannot stand. *See, e.g., Spectrum Sports*, —— U.S. at ——, 113 S.Ct. at 890–91, 122 L.Ed.2d at 257. In short, there is no specific evidence in this record of anticompetitive conduct by WMI. As the First Circuit observed in this case, the exclusive-contract claim is "even thinner" on its face than the predatory-pricing claim. *Tri–State Rubbish*, 998 F.2d at 1080.

As discussed above, at worst, WMI has acquired 30% of the relevant market with some unknown number of exclusive-dealing contracts.[6] During the time period in question, TSR has continued to gain new accounts, even winning approximately seventeen accounts from WMI. The blanket statement by WMI competitors in each of their affidavits that "[u]se of exclusive dealing contracts makes it very difficult for a competitor to enter the marketplace by taking business from WMI," does not assist this Court in understanding precisely how it has affected the market and whether the public interest has been adversely affected. At this time, it appears that there are several haulers of various sizes working in the relevant market area and that these companies continue to gain new accounts.[7] This fact, which is not disputed by TSR, suggests that competition is alive and well in this market.

---

**5.** The time period at issue in the *Barry Wright* case was three years, the same as the contracts complained of here. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir.1983).

**6.** Apparently, not all of WMI's customers were required to sign such contracts, but the materials submitted to this Court fail to specify how many WMI customers actually signed the contracts and whether any continued to seek competitive prices from other haulers.

**7.** It is not disputed that TSR obtained at least 32 additional commercial waste customers in 1991, 28 in 1992, and 96 in 1993. It is also not disputed that TSR produced a profit in both 1991 and 1992, although not in 1993. The record contains information that is subject to confidentiality orders and agreements which clearly indicates that TSR enjoys a robust economic position which enhances its competitive abilities. In addition, TSR did recover some of the accounts previously lost to WMI.

14

## C. State Claims

TSR also seeks relief under Maine antitrust and tort law. These state law claims fall under this Court's supplemental jurisdiction since they "are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case." 28 U.S.C. § 1367(a). In the present case, the Maine antitrust statute parallels the Sherman Act. *Tri–State Rubbish,* 998 F.2d at 1081. Since Plaintiff has offered no argument why there should be liability under state law in the event that the federal law provides no relief, judgment for Defendant will be granted on this count as well.

Although not specifically addressed by the First Circuit in this case, Plaintiff also seeks to recover damages for WMI's alleged "profiteering in necessities," in violation of 10 M.R.S.A. § 1105. While the statute allows a private right of action under other provisions regarding monopolies and restraint of trade, 10 M.R.S.A. § 1104(1), it does not provide such a right for a profiteering-in-necessities claim. Moreover, it is highly dubious that commercial solid waste hauling falls under the statute's definition of the "necessities of life." Plaintiff's attempt to link the disposal of commercial trash, which does not fall under the statutory definition, to the production of electricity, which is such a "necessity," is far too tenuous.

Finally, TSR's allegation of tortious interference with contractual relations also falls short. Plaintiff failed to point to any specific contract or customer with which WMI's activities interfered. Under Maine law, a plaintiff must be able to show interference by "fraud or intimidation" that procures the breach of an existing contract that would have continued but for such wrongful interference. *See C.N. Brown Co. v. Gillen,* 569 A.2d 1206, 1210 (Me.1990). Even if this Court takes as true the allegations that WMI employees and former employees made defamatory statements about TSR, no causal link to any contract or customer has been made. Therefore, this Court will retain subject matter jurisdiction for the purposes of disposing of the state claims on their merits.

## III. CONCLUSION

Accordingly, it is *ORDERED* that Defendants' Motion for Summary Judgment be, and it is hereby, *GRANTED* on Counts I, II, III, and IV of TSR's Amended Complaint.