UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

No. 92-2218

TRI-STATE RUBBISH, INC., ET AL.,

Plaintiffs, Appellants,

v.

WASTE MANAGEMENT, INC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Breyer, Chief Judge,
Torruella and Boudin, Circuit Judges.

Ralph A. Dyer for appellants.
Michael A. Nelson with whom Emily A. Bloch, Nicholas S. Nadzo and
Jensen Baird Gardner & Henry were on brief for appellee Mid-Maine
Waste Action Corp.
Robert S. Frank with whom Carl E. Kandutsch and Verrill & Dana
were on brief for appellees Waste Management, Inc., Waste Management
of Maine, Inc., Consolidated Waste Services, Inc. and Consolidated
Waste Transport, Inc.
John J. Wall, III with whom Thomas F. Monaghan and Monaghan,
Leahy, Hochadel & Libby were on brief for appellee City of Auburn.

July 13, 1993


BOUDIN, Circuit Judge. The complaint in this case

charged that a number of entities, public and private, were

seeking to monopolize the waste disposal business and

otherwise acting in violation of federal and state law. The

district court dismissed the complaint for failure to state a

claim. We affirm the district court with one exception: as

to the predation claims against the private defendants, we do

not think that state action immunity has been made out on

this record, and therefore remand those claims for further

proceedings.

I. THE BACKGROUND

This case is one of several in which state and local

communities have taken measures to cope with their waste

collection responsibilities, and private haulers have been

adversely affected and responded with antitrust suits. The

cases vary, and in this one the history is tangled and the

claims numerous. In describing the facts, we take the

allegations of the complaint as true, as is customary in

reviewing dismissals for failure to state a claim. See

Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Maine has in force statutes that give local communities

substantial authority over local waste collection and

disposal. Under this legislative umbrella, the City of

Auburn and eleven other municipalities formed in 1986 a non-

profit, non-stock corporation to assist in waste disposal.

-2- -2-

The entity--Mid-Maine Waste Action Corporation ("MMWAC")--was

then mandated to construct a facility to burn municipal waste

and derive electricity from the process. Maine law expressly

authorizes municipalities to cooperate in waste disposal

projects, Me. Rev. Stat. Ann. tit. 38, 2201, and provides

for interlocal agreements to organize public waste disposal

corporations to own or operate facilities. Id. 1304-B(5).

MMWAC issued over $42 million in bonds to construct a

waste-to-energy facility. The bonds were to be funded

through so-called "tipping fees," customarily charged to

those who dispose of waste at a landfill or other disposal

facility, and through the revenues from the sale of the

electricity. To secure the quantity of waste needed to

operate the facility economically--that is, at a high

percentage of its capacity--the MMWAC municipalities enacted

flow control ordinances. These local laws, authorized by Me.

Rev. Stat. Ann. tit. 38, 1304-B(2), required the delivery

of all solid waste generated within each municipality to

MMWAC. Each municipality also contracted with MMWAC to

deliver to it the solid waste generated in the community,

paying MMWAC whatever tipping fee was required to produce

revenues to service its debt.

Because the MMWAC incinerator-generator facility would

not be ready before 1992, MMWAC provided in the meantime for

an alternative method of disposing of the waste it received.

-3- -3-

For this interim period, MMWAC contracted with two related

entities, Consolidated Waste Services and Consolidated Waste

Transportation (collectively, "the Consolidated companies")

to operate a transfer station near the MMWAC construction

site. A transfer station is a collection point at which

waste may be processed or repackaged before being sent to its

final destination. MMWAC agreed to pay the Consolidated

companies $66 per ton to receive the waste delivered and to

dispose of the waste until the MMWAC incinerator was ready to

operate.

MMWAC's initial tipping fee was set at $75 per ton. It

is common in waste collection for municipalities to collect

residential trash themselves or to contract out this function

but to require commercial businesses to contract directly

with private haulers for their trash removal facilities.

Under the municipalities' agreements with MMWAC and under the

local flow control ordinances, private trash haulers in the

twelve municipalities and the municipalities themselves were

effectively required to deliver their trash to the transfer

station and pay the $75 per ton tipping fee to MMWAC.

Waste Management of Maine, Inc. is an operating

subsidiary of Waste Management, Inc., one of the largest

waste collection and disposal firms in the nation. The

operating subsidiary provides trash collection in various

Maine towns. In July 1990, after the transfer station

-4- -4-

agreement between MMWAC and the two Consolidated companies,

Waste Management, Inc. acquired the two Consolidated

companies; and one of the two may thereafter have been merged

into Waste Management of Maine. We refer to all four

companies, collectively, as "Waste Management."

Tri-State Rubbish, Inc., a competitor of Waste

Management of Maine, is also in the business of collecting

and disposing of commercial trash, including waste generated

by various customers in Auburn. Its affiliate, Recycling

Unlimited Services Corp., Inc., processes waste and recovers

from it recyclable commodities. Gary Hart is the principal

in both businesses. In 1990, Tri-State Rubbish declined to

deliver to the Consolidated transfer station all of the waste

collected by Tri-State Rubbish in Auburn. Tri-State

Rubbish's position was that waste capable of having recycled

commodities extracted from it was not covered by the local

flow control ordinance.

Auburn brought suit against Tri-State Rubbish in a Maine

state trial court in December 1990 to enjoin it from refusing

to deliver all of its Auburn waste to the transfer station.

In July 1992, the court rejected Tri-State Rubbish's

interpretation of Maine law and granted an injunction in

favor of Auburn. City of Auburn v. Tri-State Rubbish, Inc.,

No. CV-90-561 (Me. Sup. Ct., Androscoggin County, July 20,

-5- -5-

1992). That case, we are told, is now on appeal to the Maine

Supreme Judicial Court.

MMWAC's incinerator-generator began operating in early

1992 and almost at once MMWAC found that the waste produced

in the twelve municipalities was not enough to keep the new

facility operating at an optimal level. This led MMWAC to

seek additional waste from outside the member towns; it did

so by offering a reduced tipping fee, allegedly $45 to

municipalities who were not members of MMWAC and as low as

$28 to Waste Management of Maine for its delivery to MMWAC of

waste collected outside the twelve communities. These

reduced fees were not made available to Tri-State Rubbish.

In September 1992, Tri-State Rubbish, Recycling

Unlimited, and Hart (collectively "Tri-State") began the

present suit in federal district court. The defendants were

Auburn, MMWAC, and the four Waste Management companies: Waste

Management, Inc., Waste Management of Maine, and the two

Consolidated companies. Based on the events described above,

the complaint asserted federal and state antitrust claims, a

claim of tortious interference (by Waste Management) with

Tri-State's contractual relations, and claimed violations (by

Auburn) of 42 U.S.C. 1983 and provisions of the U.S.

Constitution.

The defendants in this federal action moved to dismiss

the complaint under Fed. R. Civ. P. 12(b)(6) for failure to

-6- -6-

state a claim upon which relief may be granted. The district

court granted the motions, concluding that the antitrust

claims were barred by so-called "state action" immunity; the

bases for dismissing the other claims are more conveniently

described below as the separate claims are discussed. Tri-

State Rubbish, Inc. v. Waste Management, Inc., 803 F. Supp.

451 (D. Me. 1992). This appeal followed.1

II. THE FEDERAL ANTITRUST CLAIMS

A half century ago the Supreme Court determined, in

Parker v. Brown, 317 U.S. 341 (1943), that Congress had not

intended the federal antitrust laws to apply to trade

restraints or monopolies imposed by state governments.

Although the antitrust laws aim at competitive markets, the

Court in Parker recognized that governments often restrict

competition for public purposes. The actions of state

governments, no less than those of the federal government

itself, were deemed not to fall within the constraints of the

antitrust laws.

After a certain amount of wobbling, it has become

settled that municipalities enjoy the protection of the

Parker doctrine if, but only if, the conduct in question is



1Although both sides have captioned their briefs to show
"Tri-State Rubbish, Inc., et al." as the plaintiffs-
appellants, the notice of appeal names only Tri-State
Rubbish, Inc. as the appellant. Our caption and other
references to Hart and Recycling Unlimited are without
prejudice to any consequences that may flow on remand from
the way the notice of appeal was framed.

-7- -7-

of a kind authorized or directed by state law. Town of

Hallie v. City of Eau Claire, 471 U.S. 34 (1985); Fisichelli

v. Town of Methuen, 956 F.2d 12 (1st Cir. 1992). In general

this immunity is not defeated by claims that the municipality

"conspired" with a private party, City of Columbia v. Omni

Outdoor Advertising, Inc., 111 S. Ct. 1344 (1991), or that

the municipality made some error under local law.

Fisichelli, 956 F.2d at 14.

Count I. In count I of its complaint, Tri-State

contends that in violation of the Sherman Act, 15 U.S.C.

1-2, Auburn and MMWAC have sought to monopolize and restrain

trade in the waste disposal business in Auburn and the other

eleven municipalities. The gist of the claim, as elaborated

in Tri-State's brief, is simple: under the local ordinances,

all solid waste generated in the twelve municipalities must

be turned over to MMWAC or its designee. Thus the waste

disposal business in these locations, including recyclable

materials, is within the sway of one entity, MMWAC.

With a couple of caveats, Tri-State concedes that state

action immunity is available as to count I if the Maine

legislature empowered municipalities to engross all solid

waste including waste that might be recycled. But it argues

that Maine's policy is to promote the recovery of recyclable

commodities from waste before the residue is burned for

electricity. It derives this priority from a declaration of

-8- -8-

policy in the Maine statute preceding the specific grants of

authority. Me. Rev. Stat. Ann. tit. 38, 1302, para. 2. It

urges us to read the Maine legislation to exclude such

recyclable waste from the authorization that allows

municipalities to control the disposition of solid waste.

The Maine statute explicitly permits a municipality to

require that "solid waste" generated within its boundaries be

delivered to "a designated disposal or reclamation facility,"

id. 1304-B(2), reclamation includes the generation of

electricity, id., and solid waste is defined to include

"useless, unwanted or discarded solid material." Id. 1303-

C(29). The statutory definition of solid waste goes on to

say that "[t]he fact that a solid waste or constituent of the

waste may have value or other use or may be sold or exchanged

does not exclude it from this definition." Id. This final

clause pretty much disposes of Tri-State's argument.

Statutes or ordinances similar to those involved in this

case exist elsewhere. Tri-State cites us to several that

have been construed not to reach waste from which recyclable

commodities could be extracted. Yet the case on which it

principally relies concerned an authorizing statute that

excluded recyclables.2 By contrast, the definitional phrase



2In Waste Management of the Desert, Inc. v. Palm Springs
Recycling Center, Inc., 11 Cal. Rptr. 2d 676 (Cal. App.),
petition for review granted, 13 Cal. Rptr. 2d 850, 840 F.2d
955 (1992), the California statute reserved the right of
anyone "to donate, sell or otherwise dispose of his or her

-9- -9-

in the Maine statute (quoted at the end of the last

paragraph) explicitly includes recyclables in the waste that

is subject to municipal control. The district court's

reading of the Maine statute follows its plain language, 803

F. Supp. at 456, and comports with the reading of the Maine

state court in the injunction action against Tri-State. City

of Auburn, supra. We see no error in the district court's

interpretation.

Tri-State also objects to the district court's ruling

that MMWAC should be treated as a municipality for state

action purposes. As a private actor, Tri-State argues, MMWAC

must show that it is subject to state supervision pursuant to

California Retail Liquor Dealers Ass'n v. Midcal Aluminum,

Inc., 445 U.S. 97 (1980). Midcal, building upon statements

in Parker and later cases, made clear that state action

immunity will extend to private actors only where they are

subject to adequate official supervision. The state, in

other words, may take anticompetitive measures itself or

authorize its municipalities to do so; but it may not license

private restraints unless the private parties are themselves

regulated.

Passing the question whether the conduct challenged in

count I is that of MMWAC (as opposed to the municipalities),



recyclable materials" and of any private company to contract
with a private waste hauler to remove segregated recyclable
materials. 11 Cal. Rptr. at 683-84.

-10- -10-

we think that MMWAC's status is that of the municipalities.

MMWAC's mission, waste disposal, is a traditional local-

government function. By statute MMWAC's directors must be

elected by municipal officers and are themselves municipal

officers. Me. Rev. Stat. Ann. tit. 38, 1304-B(5). The full

faith and credit of the municipalities may be pledged in aid

of its operations. Id. Patently MMWAC is the creature of

its member municipalities and enjoys their status. See

Interface Group, Inc. v. Massachusetts Port Authority, 816

F.2d 9, 13 (1st Cir. 1987).3

Counts II, III and III-A. These counts, which include

Tri-State's remaining federal antitrust claims, present a

different set of issues. In count II Tri-State first

challenged as a restraint of trade and attempted

monopolization the agreement between MMWAC and the

Consolidated companies. As a consequence of the interim

arrangements, Tri-State argues that Waste Management of

Maine was able to offer "predatory" prices to customers in

Auburn and other MMWAC municipalities. In Tri-State's view,

the $66 per ton payment by MMWAC to the Consolidated

companies for disposing of the waste allowed their affiliate



3The only participants named in count I are the
municipalities and MMWAC. Since their conduct is authorized
by statute, the state action doctrine applies. Contrary to
Tri-State's claim, municipalities (or their
instrumentalities) engaged in state-authorized conduct are
not themselves required to be further supervised by the
state. See Town of Hallie, 471 U.S. at 47.

-11- -11-

Waste Management of Maine effectively to reduce its $75 per

ton tipping fee to $9 ($75 less $66) and thus steal away Tri-

State's customers.4

Counts III and III-A concern the activities of Waste

Management of Maine in other non-MMWAC communities. This

competitor, says Tri-State, has been favored by MMWAC with a

low tipping fee ($24 per ton), not available to Tri-State,

for "foreign" waste delivered from outside the MMWAC

municipalities to the new incinerator-generator.5 As a

result, Tri-State has lost customers outside the twelve

municipalities to "low ball" prices. Further, the customers

are "lock[ed] up" by exclusive dealing contracts and supplied

with trash containers that can be used only for Waste

Management trash.

In analyzing these claims, the district court

distinguished between MMWAC and the Waste Management

companies. As to the former, the court pointed out that the

participating municipalities were empowered by the Maine



4Tri-State's assertion of a $9 per ton "net" tipping fee
appears to be faulty economics. The $66 per ton payment to
the Consolidated companies was to cover the cost of receiving
and disposing of the waste. Whether or not the cost to the
Consolidated companies was actually $66 per ton, it is not
likely to have been zero.

5The record does not explain why, given MMWAC's need for
fuel, it would make sense for MMWAC to offer the $24 tipping
fee exclusively to Waste Management of Maine. While we
accept the allegation as true for purposes of this appeal, we
note that MMWAC's brief denies that this is what happened.

-12- -12-

statute to control completely the collection and disposition

of waste generated within their communities, dealing if they

chose to do so with a single entity. 803 F. Supp. at 458;

Me. Rev. Stat. Ann. tit. 38, 1304-B(4). Thus, assuming

that MMWAC's interim arrangements with the Consolidated

companies favored the Waste Management companies over Tri-

State, MMWAC was protected by the state action doctrine.

As to the conduct in Counts III and III-A, the district

court noted that the Maine legislature clearly contemplated

that municipalities could buy waste from other municipalities

to make up any shortfall. 803 F. Supp. at 459; Me. Rev.

Stat. Ann. tit. 38, 1304-B(4-A)(B). A reduced tipping fee

is merely one way of "buying" such waste. Nothing in the

authorizing statute says that the same price must be offered

to everyone; on the contrary the need for long-term fuel

commitments, recognized elsewhere in the statute, see Me.

Rev. Stat. Ann. tit. 38, 1304-B(4), suggests that

arrangements with one or a few suppliers were entirely

foreseeable. We agree with the district court that MMWAC's

alleged exclusive offer of the $24 tipping fee to Waste

Management of Maine for foreign waste was authorized by

statute and is protected by the state action doctrine.

A different, and more difficult, issue is presented by

Waste Management's claim that it too is protected by the

state action doctrine. Tri-State objects that Waste

-13- -13-

Management, at least, is fully subject to the Midcal

requirement that it be supervised before any of its actions

can be protected. The district court agreed that supervision

is required. But it found that municipal, as opposed to

state, supervision is sufficient. It further held that this

obligation was satisfied by MMWAC's obligation, undertaken in

its contracts with its municipality members, to comply with

all pertinent laws. 803 F. Supp. at 461.

We agree with the district court's view, supported by

the greater weight of authority, that municipal supervision

of private actors is adequate where authorized by or implicit

in the state legislation. Although there is some precedent

to the contrary,6 we share the view of the Eighth and Ninth

Circuits, endorsed by the leading antitrust treatise, that

municipal supervision is adequate.7 As Professors Areeda

and Hovenkamp note, "it would be implausible to rule that a

city may regulate, say, taxi rates but only if a state agency

also supervises the private taxi operators." Antitrust Law,

supra n.7, at 197.



6See, e.g., Riverview Investments, Inc. v. Ottawa
Community Improvement Corp., 774 F.2d 162 (6th Cir. 1985).

7Gold Cross Ambulance & Transfer v. City of Kansas City,
705 F.2d 1005 (8th Cir. 1983), cert. denied, 471 U.S. 1003
(1985); Tom Hudson & Assocs. v. City of Chula Vista, 746 F.2d
1370 (9th Cir. 1984), cert. denied, 472 U.S. 1028 (1985);
Savage v. Waste Management, Inc., 623 F. Supp. 1505 (D.S.C.
1985); see also P. Areeda & H. Hovenkamp, Antitrust Law 
212.7c at 196-97 (Supp. 1992).

-14- -14-

At this point, our analysis of Waste Management's

position diverges somewhat from that of the district court.

As to any claim that Waste Management received favorable

tipping fees--whether through MMWAC payments to the

Consolidated companies or outright as to foreign waste--we

think "supervision" is not a requirement at all: the choice

to make such payments was that of MMWAC and its actions are

protected as state action. To treat the mere receipt of such

authorized payments as wrongful would undermine the Parker

protection afforded MMWAC and mistake the purpose of the

supervision requirement, which is to prevent the unregulated

licensing of private anticompetitive conduct.

This analysis disposes of the claims under counts II and

III against all parties including the Waste Management

defendants, so far as those claims attack the official

actions of MMWAC: the contract between MMWAC and the

Consolidated companies, the payments to the Consolidated

companies by MMWAC, and the tipping fees set by MMWAC for

Waste Management of Maine, whether for local or foreign

waste. It does not, however, resolve the attacks, scattered

throughout counts II, III, and III-A against the conduct of

Waste Management of Maine vis-a-vis its own customers. These

attacks charge Waste Management of Maine with predatory

pricing of its waste collection services, wrongful exclusive

-15- -15-

dealing by long-term contracts, and unreasonably restricting

the use of the containers it furnished.8

The Predation Claims. The district court held that the

Waste Management defendants were protected as to their

customer-related conduct under the state action doctrine.

The court reasoned that by its agreements with the

municipalities, MMWAC had committed itself to obey the law;

that Waste Management of Maine had contractual arrangements

with MMWAC; and that this contractual authority provided

sufficient municipal supervision to cast the garment of

Parker protection over Waste Management of Maine's own

conduct. 803 F. Supp. at 461. The district court noted,

however, that the contracts had not been made available to it

for inspection. Id. We are not persuaded that the rates and

contract terms Waste Management set for its own customers

have been brought within Parker.

There is simply nothing to which we have been pointed to

show that MMWAC has claimed or exercised any control whatever

over the rates that Waste Management of Maine charges to its

customers or the other terms (such as length of contract) on

which it deals. While it is conceivable (but not proved)



8MMWAC is also charged in these counts but, apart from
bare references to conspiracy, there is nothing in the
complaint to connect MMWAC with Waste Management's actions
vis-a-vis its own customers except the favorable tipping
fees. Since the fee payments are state action, we do not
think that any claim has been stated against MMWAC based on
Waste Management's alleged predation.

-16- -16-

that MMWAC claims such authority with respect to customer

contracts in the MMWAC communities, it is certainly less

likely that it does so in the non-MMWAC communities which are

the locales for the predation alleged in counts III and III-

A. Absent a showing of control, questions of state

authorization and the adequacy of official supervision need

not even be reached.

It is a close question whether the judgment of dismissal

should nevertheless be affirmed on an alternative ground,

namely, that the allegations of the complaint fail to state a

predation claim even if the state action doctrine is ignored.

This alternative course is urged by Waste Management, and we

have given it serious consideration. The requisites for

proving predatory pricing are demanding, because the

conditions under which it is plausible are not common, and

because it can easily be confused with merely low prices

which benefit customers. See Barry Wright Corp. v. ITT

Grinnell Corp., 724 F.2d 227 (1st Cir. 1983). Exclusive

dealing contracts may also benefit customers and are unlawful

only upon a particularized showing of unreasonableness.

Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320

(1961).

Thus a complaint that did no more than allege predatory

pricing or exclusive dealing contracts with nothing more

specific might well be susceptible to dismissal for failure

-17- -17-

to state a claim. The present complaint is, in a sense, both

better and worse. It is somewhat more specific, asserting at

one point that the prices offered by Waste Management of

Maine were as much as 50 percent below market rates, at other

places that the rates were sometimes below variable cost, and

that the exclusive dealing contracts were for three years.

At the same time, the complaint goes some distance

toward undermining its own predatory pricing claim. Tri-

State implies that the low prices offered by Waste Management

of Maine were, in some instances at least, the result of the

favorable tipping fees that MMWAC made available to it. If

this is the whole of the charge, then there is no predatory

pricing claim at all. A company that rationally prices its

own product or service at or above its own costs does not

violate the Sherman Act merely because its costs, and thus

its prices, are lower than a rival's costs; and this is true

even though its lower costs may be due to the generosity, or

foolishness, of another supplier who has charged the company

too little for an input. See generally Brooke Group Ltd. v.

Brown & Williamson Tobacco Corp., 61 U.S.L.W. 4699, 4702-03

(June 21, 1993).

Even apart from this possible explanation for lower

prices, Tri-State's predatory pricing claim is on the edge of

inadequacy. Although the complaint asserts that Waste

Management is pricing below variable cost--the normal test of

-18- -18-

predation, see Barry Wright--it is not clear what basis if

any Tri-State has for this assertion. The reference to

prices 50 percent below customary prices might invite some

suspicion, but in an industry like waste collection, in which

customers are scattered along routes, the variable cost of

serving additional customers to piece out a route may be

extremely low.

The claim that the duration of the exclusive contracts

is unlawful is, if anything, an even thinner case on the face

of the complaint. That some of the contracts are three

years, the only specific in the complaint, might invite

curiosity, but it does not even begin to establish

illegality. Under Tampa Electric Co., it is the totality of

reasons for such a term, and its actual impact on

competition, that are decisive. Here, we know nothing about

the number of customers affected, the size of any

cancellation penalty, the practice in the industry, or

anything else that might help to paint a picture of the

competitive scene. Of course, a plaintiff is required only

to plead a claim, not to recite evidence, but the essence of

a claim like this one lies in the details.

A final concern is that predatory pricing is a section 2

claim and is condemned only where it is part of an attempt to

monopolize or is used to secure or retain an actual monopoly.

E.g., C.A.T. Industrial Disposal, Inc. v. Browning-Ferris

-19- -19-

Industries, 884 F.2d 209 (5th Cir. 1989).9 Tri-State

certainly does allege both the aim of monopoly and the

actuality, but its complaint supplies very little information

(e.g., market shares in a properly defined market) from which

one can frame a judgment whether this claim is plausible. The

complaint does say that Waste Management, Inc. and its

subsidiaries are the largest waste handling and disposal

business in Maine and in the nation; but the primary issue is

dominance or prospective dominance in a properly defined

economic market.

One's first instinct is that monopoly would be hard to

sustain in a business in which the basic equipment is a truck

and entry is apparently easy. See generally United States v.

Waste Management, Inc., 743 F.2d 976 (2d Cir. 1984). But

waste collection might in theory be subject to local monopoly

in some circumstances. Thus, the efficiencies of collecting

from a number of closely located customer sites could make

new entry difficult, especially if the community were small

and many customers were tied to an existing dominant hauler

by long-term contracts; and environmental restrictions on new

landfills in some areas could give a decisive advantage to a



9Exclusive dealing, which can be attacked inter alia
under section 1 of the Sherman Act, 15 U.S.C. 1, can be
condemned without a showing that monopoly power is present or
within reach. But the impact on competition is part of the
equation and, absent a potential monopoly or oligopoly, the
competitive impact may be hard to establish.

-20- -20-

hauler that controlled the only available facility. There

are some hints, but only hints, in the complaint that Waste

Management of Maine may enjoy an advantage of this latter

sort.

Taking everything together, we think it wiser not to

affirm the dismissal of the predation claims on the

alternative ground. Thin and doubtful though they may be, we

cannot say at this stage that these claims are hopelessly

inadequate if Parker's shield is removed. The district court

did not rest its decision on that ground, and it has been the

subject of only a small portion of the briefs on this appeal.

The old prejudice against summary disposition of antitrust

claims has diminished, First National Bank v. Cities Services

Co., 391 U.S. 253 (1968), but the grant of a Rule 12(b)(6)

motion on the predation claims would, at least at this time,

be a shade too summary.

We underscore the limited nature of our remand. These

claims can be stated, if at all, only against the Waste

Management defendants. The district court is fully entitled

to demand more specific explanations from Tri-State as to the

gray areas in its predation claims, including the basis for

the charge of pricing below variable cost, the basis for the

market definitions urged, and the basis for any claim that

monopoly power exists or could plausibly be secured in a

properly defined economic market. Nothing in this opinion is

-21- -21-

intended to preclude summary disposition at a later stage,

and this need not mean much later if these claims prove to

have little substance.10

III. TRI-STATE'S REMAINING CLAIMS

Count IV of the complaint reasserts, under the Maine

antitrust statute, the federal antitrust claims made in the

earlier counts. The Maine antitrust statutes parallel the

Sherman Act, see Me. Rev. Stat. Ann. tit. 10, 1101 et

seq., and Tri-State offers no separate argument for liability

under state law. In point of fact, the Maine statute under

which MMWAC is organized also has an explicit exemption from

state antitrust laws for specified municipal contracts or

ordinances. Me. Rev. Stat. Ann. tit. 38, 1304-B(6).

Accordingly, the dismissal of the state antitrust claim is

sustained except as to the predation claims against the Waste

Management defendants.

In count V, Tri-State claims that the solicitation of

Tri-State customers by Waste Management of Maine was a

violation of Maine law against interference with advantageous

contractual relations. The gravamen is that this

solicitation was unlawful because achieved through

discriminatory tipping fees, predatory pricing, and other



10The Waste Management defendants are also free to
pursue their Parker defense as to the predation claims. Our
holding is that on this record there is an insufficient basis
for determining that Parker immunity exists as to the terms
on which Waste Management of Maine deals with its customers.

-22- -22-

wrongs. The district court dismissed the count on the ground

that the actions in question were within the ambit of the

state legislation and therefore could not be "wrongful

interference." 803 F. Supp. at 463-64. In this court, Tri-

State does not argue the claim at length, asserting instead

that its tortious interference claim is "contingent" upon our

finding that the alleged anticompetitive conduct enjoys no

immunity.

We think the fixing of tipping fees by the

municipalities and MMWAC is embraced by the Maine statute--

Tri-State makes no effort to show the contrary--but, as

earlier stated, we cannot find on this record that the terms

on which Waste Management of Maine dealt with its own

customers has been the subject of regulation. Accordingly,

count V, so far as it makes allegations against the private

defendants based on Waste Management of Maine's dealings with

its own customers, is remanded for consideration together

with the predation claims. Nothing in the complaint explains

why MMWAC is responsible for such contracts, however, and as

to it the dismissal of count V is sustained for failure to

state a claim.

Count VI of the complaint asserts a claim under 42

U.S.C. 1983 against Auburn. In part, this count says that

the City of Auburn injunction action against Tri-State

represented discriminatory prosecution in violation of due

-23- -23-

process principles. Count VII makes the same complaint based

on equal protection principles. Count VIII, the final count

of the complaint, re-asserts the allegations of counts VI and

VII as violations of Maine's own civil rights statutes. Me.

Rev. Stat. Ann., tit. 5, 4682-83. On appeal, Tri-State

advises that it elects not to press the selective prosecution

issue in this court, reserving it for its state court appeal.

This leaves only Tri-State's final contention--the other

subject of its count VI claim--that the Auburn flow control

ordinance is "an unconstitutional taking of [Tri-State's]

property without compensation." Tri-State's theory seems to

be that the Auburn flow control ordinance has crippled Tri-

State's waste disposal business. This, says Tri-State, is a

business in which it has engaged for many years and its

interests in continuing without undue interference deserve

protection as "investment-backed expectations." Penn Central

Transp. Co. v. New York City, 438 U.S. 104, 124 (1978).

While the Supreme Court did use the quoted phrase to

describe a pertinent consideration in takings cases, the Penn

Central opinion actually reaffirms that government for public

purposes can, without compensation, impose general

regulations that may severely limit the value of an ongoing

business. The Supreme Court has in fact twice upheld

municipal ordinances granting one waste collector the

exclusive right to collect and dispose of waste within the

-24- -24-

community, putting existing haulers out of business.11

Despite Tri-State's claims that these cases are outdated,

nothing in the Supreme Court's more recent decisions raises

serious doubts about their validity. The Sixth Circuit has

rejected an argument almost identical to Tri-State's. Hybud

Equipment Corp. v. City of Akron, 654 F.2d 1187 (1981),

vacated on other grounds, 455 U.S. 931 (1982).

* * *

In this case, we have concluded that, with the possible

exception of its predation claims against the private

defendants, none of Tri-State's claims has any merit. This

does not mean that there is no basis for Tri-State's concerns

about the competitive impact of the MMWAC arrangements, or

for its assertion that the plan is unfair to it or bad for

recycling. But government action may be anticompetitive,

unfair or unwise without being illegal. Absent illegality,

the solution lies with the legislature and not in the courts.

The judgment of the district court is affirmed except

for the dismissal of the federal and state antitrust claims

in counts II-V and the tort claim in count VI insofar as

those counts charge the Waste Management defendants with

predation or related anticompetitive conduct toward



11See California Reduction Co. v. Sanitary Reduction
Works, 199 U.S. 306 (1905); Gardner v. Michigan, 199 U.S. 325
(1905).

-25- -25-

customers. Those claims are remanded for further proceedings

in accordance with this opinion. No costs.

It is so ordered.

-26- -26-